**Pennsylvania National Mutual Casualty Insurance Company v. Johnson**

C.P. of Delaware County, nos. 05-2045, 05-3358.

*Constantine Z. Economides,* for plaintiff.
*Robert C. Ewing,* for defendants.

BURR, *J.,* January 16, 2007—

## DECLARATORY JUDGMENT ORDER AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

And now, January 16, 2007, upon consideration of the record as established in this matter as well as the briefs, evidentiary submissions and proposed findings of fact and conclusions of law submitted by the parties and after a hearing thereon, it is hereby ordered and decreed that the relief requested by the plaintiff, Pennsylvania National Mutual Casualty Insurance Company d/b/a Penn National Insurance,[1] in its complaint for declaratory judgment will be, and hereby is, denied and dismissed. This court finds that Penn National had both a duty to defend and indemnify its insured, Duane Johnson, for the claims brought against him sounding in negligence in the matter of *Janel Cox-Harris v. Duane Johnson* in the Court of Common Pleas of Delaware County at no. 03-2488. Moreover, the court finds that in denying the foregoing coverage, Penn National acted in bad faith pursuant to 42 Pa.C.S. §8371.[2] The court thereby, and

---

1. For the sake of brevity and to avoid confusion in referencing the differences in their status as parties in the three cases involved in this litigation, the above-captioned individuals will not be referred to herein as plaintiff and defendant, but as Mr. Johnson, Ms. Cox-Harris, and Penn National.

2. "42 P.S. §8371.

"In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take the following actions:

"(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3 percent.

"(2) Award punitive damages against the insurer.

"(3) Award court costs and attorney fees against the insurer." (42 P.S. §8371.)

hereby awards in favor of the declaratory judgment defendant, Janel Cox-Harris, as the administrator of the estate of Sami Ibn Kareem Toler and as the parent and natural guardian of Sami Jaquan Hassan Toler, a minor, and as assignee of any and all claims of the declaratory judgment defendant, Duane Johnson, and against the declaratory judgment plaintiff, Penn National, on claims sounding in breach of contract, the sum of $2,490,666[3] in compensatory damages and, for denial in bad faith of coverage to its insured, the declaratory judgment defendant, Duane Johnson, legal interest thereon in an amount equal to the prime rate plus 3 percent from the date of Mr. Johnson's claim made on July 17, 2003, and the sum of $6,000,000 in punitive damages, plus court costs and attorney fees. the court supports the foregoing order with the ensuing findings of fact and conclusions of law.

## FINDINGS OF FACT [4]

(1) The underlying complaint alleging wrongful death and survival actions captioned *Janel Cox-Harris, as*

---

3. This amount is the sum of award of the arbitrator to whom the underlying action was submitted following a surrender of jurisdiction by the assigned judge, the Honorable Kathrynann W. Durham, of this court. The arbitrator, Chris M. Jamison, Esquire, initially valued the wrongful death action at $1,936,000 and the survival action at $1,800,000 for a total of $3,736,000. However, finding that Mr. Johnson bore 2/3 of the liability for negligence and Mr. Toler 1/3 thereof in the incident that gave rise to the litigation, the award was reduced to the sum reflected hereinabove. (Decision and award of the arbitrator, p. 7, trial/hearing exhibit P-G, vol. II.)

4. It is here noted that, with the exception of Penn National's interpretation of pleadings and the circumstances surrounding its denial of coverage, including its view of the facts of Mr. Johnson's guilty plea and conviction, there has been little to no dispute with regard to the other factual findings made by this court.

*administrator of the estate of Sami Ibn Kareem Toler and as the parent and natural guardian of Sami Jaquan Hassan Toler, a minor v. Duane Johnson* at number 03-2488 in the Court of Common Pleas of Delaware County, PA, was filed on March 6, 2003 subsequent to Mr. Johnson's guilty plea to a charge of murder in the third degree (or voluntary manslaughter) as a result of the shooting death of the decedent, Sami Ibn Kareem Toler, arising from a physical confrontation that took place in Chester, Pennsylvania in the early morning hours of April 14, 2001. (Cox-Harris negligence complaint, no. 03-2488, trial/hearing exhibit P-A, vol. II.)

(2) The negligence action was assigned to the Honorable Kathrynann W. Durham, who advised counsel for the parties that it is her policy not to try cases involving incarcerated parties until their release from prison. Since Mr. Johnson's release therefrom would not take place for two or more years, in the interest of resolving the matter more quickly, the parties stipulated to have the case transferred to binding arbitration. Judge Durham subsequently issued an order on May 17, 2004 relinquishing jurisdiction of the case from the auspices of the Delaware Court of Common Pleas. (Order transferring case to binding arbitration, trial/hearing exhibit P-F, vol. II.)

(3) The underlying facts of the shooting were determined by the arbitrator, whose finding that Mr. Johnson had acted negligently and not intentionally in causing Mr. Toler's death, are set forth below. It is here noted, that despite timely notice of the arbitration hearing, Penn National chose neither to appear at this proceeding, nor to intervene or otherwise protect any rights that could have been affected by the following decision of the ar-

bitrator and the damages he awarded by filing a declaratory judgment petition:

"On April 14, 2001[,] the defendant, Duane Johnson, had occasion to go to 710 McIlvane [sic] Street in Chester, Pennsylvania (premises) along with his uncle. Also present was the decedent, Sami Toler[,] and a young wom[a]n, unnamed, but identified as Sami Toler's cousin. It was approximately 3 a.m. and Mr. Johnson and his uncle were outside the premises, near the street, and were engaged in a conversation about food. The young wom[a]n then joined in the conversation and made a sexually suggestive comment. Mr. Johnson dismissed the young woman. However, Mr. Toler became agitated when he perceived that his cousin was being disrespected. Mr. Toler first became verbally aggressive and then suddenly approached Mr. Johnson's uncle and struck him with a closed fist. Inside his fist, Mr. Toler held a handgun as he punched the uncle. Toler then directed his attention to Mr. Johnson. He struck Mr. Johnson in the chest and in the nose. The blow to the chest caused Mr. Johnson considerable pain because he had recently injured his sternum in an automobile collision. Mr. Toler continued to grasp the handgun in the same hand he used to strike Mr. Johnson. During the assault, the handgun dislodged from Mr. Toler's grip and fell on Mr. Johnson's uncle, who was lying on the ground unconscious. At this point, Mr. Johnson then grabbed the handgun. Mr. Johnson did have the opportunity to throw away the handgun and run away to diffuse the dangerous situation. Mr. Johnson, in response to cross-examination, admitted these facts at the time of arbitration. Instead, he chose to hang onto the gun. Mr. Toler then continued the physical assault. During the assault, Mr. Johnson kept his finger on the trigger. The firearm then accidentally dis-

charged one time into Mr. Toler's shoulder. There were then several subsequent shots in rapid succession during the struggle. Some of the rounds struck Mr. Toler. There was also some evidence of fragments having struck Mr. Toler's buttocks. This was presented as evidence of a ricochet and not as a directly pointed firearm, which point is accepted as fact.

"It is this arbitrator's finding that Mr. Johnson never intended to discharge the firearm. Instead, the firearm went off accidentally during the struggle. Following the shooting, Mr. Johnson left the scene. The shooting victim, Sami Toler, died as a result of his wounds. There was evidence that Mr. Toler continued to struggle after being shot and did not immediately pass away. He was transported to Crozer Chester Medical Center in critical condition and underwent surgery.

"The police reports and criminal complaint were admitted into evidence without objection. These documents along with Mr. Johnson's testimony reveal he was later located and interviewed by officers from the Chester Police Department. During the interview[,] he admitted to many of the initial facts as detailed in the arbitration. However, Mr. Johnson told the police he didn't know the direction from which the shots were fired. Despite this discrepancy, this arbitrator finds that the testimony given at the arbitration was credible and that it was, in fact, Mr. Johnson who accidentally shot Mr. Toler during the course of the struggle.

"Mr. Johnson was eventually arrested by the Chester Police Department. The initial charges were criminal homicide, murder, aggravated assault, firearms not to be carried without a license and possessing an instrument of crime. Mr. Johnson was represented in the criminal

proceedings by Mark Much, Esquire. Eventually[,] the district attorney offered Mr. Johnson a plea bargain of 5-10 years in prison if he pled guilty to voluntary manslaughter with no mandatory minimum. Mr. Johnson did not feel he was guilty. However, he indicated that he would not risk going to trial and being sentenced to life in prison. He was married and had three children at home. He emphasized that he needed to support his family and provide guidance to his children. If he were sentenced to life in prison, he would never again be able to provide such assistance. Therefore, he reluctantly entered the plea bargain on June 17, 2002 before the Honorable Charles Keeler. All other charges were withdrawn. At the sentencing hearing[,] Mr. Johnson reiterated that the shooting was accidental and he 'would never go out of his way to do any harm to anyone intentionally.' Mr. Johnson is now serving his sentence at the State Correctional Facility in Somerset, Pennsylvania." (Decision and award of the arbitrator, pp. 2-4, trial/hearing exhibit P-G, vol. II.)

(4) The guilty plea colloquy undertaken between Mr. Johnson and his attorney before the presiding Delaware County criminal court judge, the Honorable Charles C. Keeler, establishes the following:

(a) Mr. Johnson was initially charged by the Commonwealth with murder in the first degree, murder in the second degree, murder in the third degree, aggravated assault, recklessly endangering and voluntary and involuntary manslaughter. (Guilty plea hearing transcript— *Commonwealth of Pennsylvania v. Duane Johnson,* no. 698-01, 6/17/02 N.T. 11, trial/hearing exhibit P-M, vol. II; criminal complaint against Mr. Johnson, trial/hearing exhibit P-K, vol. II.)

(b) Mr. Johnson accepted a negotiated guilty plea on the charge of "'voluntary manslaughter', which is, in essence in this Commonwealth, known as 'imperfect self-defense' . . . [i.e.] that [Mr. Johnson was] acting in self-defense but not to the extent that would justify [his] actions that day." (*Id.* at 11-12.) In exchange for his negotiated guilty plea, Mr. Johnson received a prison sentence of from five to 10 years, less time served. (*Id.,* 16.)

(c) The court explained the charge of voluntary manslaughter as arising when the "defendant kills in the heat of passion under an unreasonable mistaken belief in justifying circumstances . . . [or] imperfect justification." (*Id.,* 19.) The court went on to explain that, in cases of self-defense, courts are more strict where deadly force is used as a means of self-protection. (*Id.*) The court explained that voluntary manslaughter was committed when deadly force was used in an unreasonable belief in the justification to use that degree of force. (*Id.,* 20.)

(d) When asked by the court whether he had anything to say for his own benefit, Mr. Johnson replied, "I just want to apologize to the family, because I would never go out and do any harm to anybody intentionally." (*Id.,* 23.)

(5) The 29-paragraph complaint filed on behalf of the decedent and Ms. Cox-Harris' child with the decedent, alleges in paragraphs 7 through 9 thereof that Mr. Johnson "did unintentionally and negligently shoot the decedent four times," and that the death occurred as the proximate result of Mr. Johnson's "careless, and/or reckless actions or inactions which include, but are not limited to the following:

"(A) Pointing a loaded firearm in the direction of the deceased;

"(B) Producing a firearm during a heated argument;

"(C) Possessing a loaded firearm when acting under intense passion;

"(D) Failing to properly keep his firearm pointed in a safe direction;

"(E) Failing to keep his finger off the trigger;

"(F) Shooting in the direction of the deceased;

"(G) Failing to warn the deceased of an imminent shooting;

"(H) Possessing a firearm when he knew or should have known that he was prone to act out in intense passion;

"(I) Such other acts of negligence, carelessness and/or recklessness as will be revealed during the course of discovery and throughout the litigation.

"(8) Duane Johnson did not intend to kill the deceased.

"(9) The injuries and death of the deceased resulted solely from the negligence, carelessness, and/or recklessness [sic] actions of Duane Johnson, and were in no manner caused by any action or inactions [sic] on the part of the plaintiffs and/or the deceased." (Cox-Harris negligence complaint, paragraphs 7 and 8, trial/hearing exhibit P-A, vol. II.)

The court finds that the entirety of the Cox-Harris complaint plead claims sounding in negligence.

(6) Mr. Johnson filed only a 12-paragraph pro se answer to Ms. Cox-Harris' negligence complaint, thus rendering it unclear as to which of the specific allegations he was responding, except for paragraph 7 with its lettered subparagraphed averments of specific acts of neg-

ligence. Moreover, his answer to paragraph "5", which is missing from the misnumbered complaint, the numbers of which jump from paragraphs "4" to "6", relates, "admitted in part, denied in part, d[e]fendant denies he negligently shot the deceased." (Answer to Cox-Harris negligence complaint, paragraph 5, trial/hearing exhibit P-C, p. 1, vol. II.) Paragraph 6 of the complaint alleges that, after an argument, Mr. Johnson shot the deceased four[5] times, "unintentionally and negligently," to which Mr. Johnson replied in paragraph 5 of his answer, "admitted in part, denied in part. D[e]fendant denies he negligently shot the deceased." (Answer to Cox-Harris negligence complaint, paragraph 5, trial/hearing exhibit P-C, p. 1, vol. II.) Mr. Johnson's response to paragraph 6 of the complaint admits the shooting of the deceased, but

---

5. According to the Delaware County, Pennsylvania's Medical Examiner's report, the decedent was shot only three times. (3/1/2006 N.T. (declaratory judgment hearing) 73.) Dr. Frederick Hellman, testifying on behalf of Penn National, said that one bullet entered from the left upper back about an inch and a half below the top of the shoulder, traveling from left to right and downward through the body; that another had entered through the left to mid lower back and traveled from left to right going downward and frontward; and that a third had entered at the back of the left thigh, approximately 31 inches above the heel and exited forward toward the rightward side of the left thigh. (*Id.,* 73-75.) Dr. Hellman further testified that surgery had removed portions of the skin that were in the bullets' paths. (*Id.,* 77.) Nevertheless, it is beyond cavil that Penn National did not investigate or ascertain, before denying coverage, that there was one less shot than four, nor the circumstances under which any shot had been fired, nor the direction from which they came. Penn National posited that no gunshot residue had been found on Mr. Toler's clothing. However, the clothing had been partially destroyed, rendering a conclusive finding on this issue impossible. The medical examiner also said he thought the shots had been delivered from a further distance than claimed. However, Mr. Toler's skin surrounding his wounds had been removed, rendering a finding of this sort questionable.

sets forth his own statement of facts surrounding the incident to support his claim that he had acted solely in self-defense. (Answer to Cox-Harris negligence complaint, paragraph 6, trial/hearing exhibit P-C, p. 1, vol. II.) The averment in paragraph 8 of the complaint that Mr. Johnson did not intend to shoot the deceased was answered, "admitted". (Answer to Cox-Harris negligence complaint, paragraph 8, trial/hearing exhibit P-C, p. 2, vol. II.) Finally, on the last page of his answer to Ms. Cox-Harris' negligence complaint, Mr. Johnson submitted two unnumbered paragraphs respectively referencing the entirety of the allegations in the wrongful death and survival actions set forth in the complaint with the response, "It is specifically *denied.*" (Answer to Cox-Harris' negligence complaint, unnumbered closing paragraphs, trial/hearing exhibit P-C, p. 3, vol. II.)

(7) The record reflects, and Penn National does not dispute, that it received the following correspondence during the relevant times from Ms. Cox-Harris' attorney: (1) a letter dated July 17, 2003, putting Penn National on notice of Mr. Johnson's claim and asking that Penn National provide Mr. Johnson with defense counsel; (2) a copy of Ms. Cox-Harris' complaint by certified mail on October 21, 2003; (3) a copy of a letter to Mr. Johnson dated March 26, 2004, advising that the negligence case would be litigated through arbitration; (4) a copy of a letter dated May 12, 2004, to Chris M. Jamison, Esquire, advising Mr. Jamison of his appointment as arbitrator of the dispute; (5) a copy of a letter dated July 1, 2004, advising Mr. Jamison of the requested arbitration hearing date of September 14, 2004; and (6) a copy of the decision and award of the arbitrator by certified mail delivered on November 15, 2004 (Letters from Ms. Cox-

Harris' attorney to Penn National, trial/hearing exhibit P-N vol. II.)

(8) The record reflects that, on November 21, 2003, or approximately four weeks following the receipt of a copy of Ms. Cox-Harris' complaint, David C. Zielinski of Penn National issued the following "Declination of Coverage" letter to Mr. Johnson:

"Please be advised that, as discussed more fully herein, Penn National Insurance must respectfully decline your request for coverage of this claim as submitted under your homeowner policy.

"Penn National received notice of the above-referenced matter from Attorney Robert Ewing by way of certified mail on or about October 22, 2003. The information and/ or documents in our possession concerning this matter currently consist of the lawsuit filed in the Delaware County Court of Common Pleas.

"Our information to date reveals that this matter involves a claim by the estate of Sami Toler against Duane Johnson which arises out of an argument which occurred at 710 McIlvaine [sic] Street, Chester, PA and resulted in your fatally shooting Toler.

"We understand that you are submitting this claim for coverage under a homeowner policy issued by Penn National Insurance pursuant to policy no. *** ******* for the policy period from 3/31/01-3/31/02. As previously mentioned, we regret to advise you that Penn National Insurance must respectfully decline your request for coverage of this claim as submitted under your policy.

"We refer you to your policy of insurance, particularly HO ** ** edition date 4/91, under section II—Liability coverages under exclusions, which reads in part as follows:

"(1) Coverage E—Personal liability and coverage F—Medical payments to others do not apply to 'bodily injury' or 'property damage'.

"(a) Which is expected or intended by the 'insured'.

"Our reading of the facts of this lawsuit, in which the plaintiff [sic] was shot four [sic] times, would indicate that the bodily injury which resulted, would be expected or intended.

"In view of the foregoing, Penn National Insurance must respectfully decline your request for coverage of this claim as submitted. If there are any other facts or circumstances which you believe in any way alter Penn National Insurance Company's position regarding the absence of coverage, kindly provide us with such information and/or documentation at your earliest convenience.

"In any event, please be advised that Penn National Insurance reserves any and all of its rights under any of the provisions, definitions, conditions or exclusions contained in any insurance policy issued by Penn National Insurance to Duane Johnson. Furthermore, upon the discovery of any other facts and issues relating to coverage of this matter, Penn National reserves its rights to modify or amend its coverage position and assert any defenses based upon any of the policy provisions, definitions, conditions or exclusions, whether or not specifically mentioned herein.

"Please do not hesitate to contact us in the event either [sic] you have any questions or comments regarding this matter." (Trial/hearing exhibit P-B, p. 15, vol. I.)[6]

---

6. Penn National has averred that besides reading the complaint, it also determined that Mr. Johnson had pleaded guilty to voluntary manslaughter and that it had made a call to the prothonotary to inves-

(9) There is no issue that, despite its reservation of rights in the foregoing Declination of Coverage notice and invitation to Mr. Johnson to notify the company of any events and additional information that might trigger coverage, plus prior notification that the claims against its insured would be tried at arbitration, Penn National made no additional contact with its insured, Duane Johnson, until sending notice on February 24, 2004 that Mr. Johnson's homeowner's policy had been terminated due to a substantial increase in hazard by reason of willful or negligent acts after the insured had shot and killed a man on April 14, 2001 and pleaded guilty to manslaughter.

(10) Two years after Ms. Cox-Harris' negligence suit was filed, one year after cancelling Mr. Johnson's insurance policy, some seven months after notification of the arbitration proceeding and four months after entry of the arbitrator's decision that Mr. Johnson's actions in shooting the decedent were wholly negligent, Penn National, on February 22, 2005, filed this declaratory judgment action seeking a ruling that it never had a duty to defend or indemnify the insured. The declaratory judgment defendants, Ms. Cox-Harris and Mr. Johnson, filed their action alleging breach of contract and bad faith on March 24, 2005. The record is clear that before filing this action:

---

tigate the wrongful death claim. It is self-evident that these additional efforts would hardly constitute a complete and thorough investigation of its insured's claim pursuant to insurance industry standards. Moreover, there was more to be determined in the law surrounding these issues beyond the reality of Mr. Johnson's guilty plea, and the prothonotary could hardly be deemed qualified to provide that kind or level of information to Penn National.

38

(a) Penn National's declination of coverage notice sent on November 21, 2003 was based solely upon a review of the Cox-Harris complaint in negligence, a discovery that Mr. Johnson had pleaded guilty to voluntary manslaughter and a call to the prothonotary regarding the complaint and of no other document, nor of any evidence at all involved in this incident. Penn National's contention that the complaint itself alleged an intentional act because the incident it arose from involved "four shots" is merely a self-serving interpretation of the averments therein.

(b) Penn National ignored every notice regarding the status and procedural posture of the *Cox-Harris v. Johnson* litigation until after the arbitrator had issued his findings of fact and awarded damages to Mr. Johnson. Moreover, knowing that the arbitration had been deemed binding by Judge Durham, clearly a judicial officer of this court, Penn National willingly took no part in it, nor made any timely effort whatsoever to protect rights that could have been affected thereby.

(c) The record is clear that Penn National: (1) conducted no investigation of the facts and circumstances surrounding Mr. Johnson's claims whatsoever before or after denial of coverage and the arbitration hearing; (2) that its review of the law regarding coverage for such incidents was cursory and incomplete; (3) that it never interviewed Mr. Johnson following receipt of his claim letter, nor requested a written statement from him; (4) that it never contacted Ms. Cox-Harris' attorney for further explication of the facts; (5) that it declined coverage without a review of the police and medical examination reports and the guilty plea colloquy; (6) that it declined coverage without interviewing anyone associated with the claim; and (7) that it did not file this declaratory

judgment action until after Mr. Johnson's total negligence in causing the death of the decedent had been determined extrajudicially and damages awarded in proceedings that Penn National willingly took no part in, nor made any timely effort whatsoever to protect rights that could have been affected thereby.

(d) Penn National ignored and did not respond to Ms. Cox-Harris' offer to settle the underlying suit for the instant policy limit of $100,000.

The court accepts the opinion of plaintiff's expert, Mr. Bernd Heinz, that Penn National's inaction with regard to all of the foregoing was in derogation of the standards and practices of insurance companies and that it constituted bad faith.

(11) Penn National utilized the instant declaratory judgment litigation to set forth numerous defenses: (1) that Mr. Johnson had admitted in his answer to the complaint that he had not negligently shot the decedent; (2) that evidence obtained subsequent to its declination of coverage, including Mr. Johnson's guilty plea, provided an ex post facto justification for its decision to decline coverage in the first instance; (3) that this court must not be bound by the findings and award of the arbitrator that Mr. Johnson was negligent in deciding whether Penn National is required to indemnify Mr. Johnson for the damages awarded against him; (4) that it was not in privity with Mr. Johnson and, therefore, is not estopped from challenging the arbitration award;[7] and (5) that Penn

---

7. Along these lines, Penn National contends that it was reasonable for it not to involve itself in the arbitration process because its interest was adverse to Mr. Johnson's at the time. Nevertheless, the declaratory judgment procedure is a necessarily "adverse" one in and of itself,

National was not obligated nor required to defend its rights in any forum because its unilateral interpretation of the averments in the complaint and decision not to further investigate the merits of the case had been reasonably based.

Nevertheless, this court finds that review of Mr. Johnson's answer to the underlying complaint, read as a whole, clearly adduces a denial of shooting the decedent intentionally, and that it was Penn National's reading thereof that was "artful" and clearly not in keeping with its duty of good faith to Mr. Johnson, nor to his fiduciary interests. Moreover, the court finds that Mr. Johnson's intentionality in committing voluntary manslaughter has never been conclusively established against him in any trial, and is, at best, ambiguous, nor was there need to readjudicate the issue sub judice because the denial of coverage was neither reasonable, nor made in good faith. Penn National merely sought, by means of this action, an ex post facto revisiting of facts it never investigated nor challenged, and a rubber stamping of its own failures to act long after those facts had become established in Mr. Johnson's favor in the law. Therefore, the court accepts the arbitrator's award and decision of negligence on the part of Mr. Johnson and holds that Penn National acted unreasonably and in bad faith in not conducting an adequate investigation of Mr. Johnson's claim before denying coverage and is thus required to indemnify its insured against the damages awarded by the arbitrator. Because the court finds that Penn Na-

---

and, had Penn National timely availed itself of this remedy, the issues raised here below would have been timely resolved long ago. Therefore, the voluntary decision to sit for so long on the rights now being asserted cannot be considered reasonable, even now.

tional's declination of coverage to Mr. Johnson was not reasonably based due to the failure to conduct an adequate investigation before rendering that decision, it is unnecessary to consider evidence obtained thereafter purportedly adducing that Penn National had made the correct decision all along.[8]

## CONCLUSIONS OF LAW

(1) The question of whether a loss is covered by an insurance policy and, in cases such as this, whether an insurer has a duty to defend its insured, is a question of law which may be decided by the court. *Donegal Mutual Insurance Co. v. Ferrara,* 380 Pa. Super. 588, 590, 552 A.2d 699, 700 (1989). Pennsylvania law regarding the question of an insurer's duty to defend its insured is well settled. An insurer's duty to defend is a distinct obligation, different from, and broader than, its duty to indemnify. *Erie Insurance Exchange v. Transamerica Insurance Company,* 516 Pa. 574, 533 A.2d 1363 (1987); *D'Auria v. Zurich Insurance Co.,* 352 Pa. Super. 231, 507 A.2d 857 (1986). An insured has purchased not only the insurer's duty to indemnify successful claims which fall within the policy's coverage, but also protection

8. Penn National sought entry into evidence of a police statement given by purported eyewitness Liaya Toler, a relative of the decedent, that the shooting was intentional. The court denied that motion on grounds of hearsay because Ms. Toler was not present for cross-examination sub judice, nor had she been subjected to cross-examination in the criminal case. (3/1/06 N.T. 81-84, 203.) If this ruling is challenged in a subsequent appeal of this order, it is here noted that any equivocation in testimony from Ms. Toler that Mr. Johnson had shot Mr. Toler intentionally would render it unreliable and any testimony consistent with the police report would arguably be deemed prejudicial inasmuch as the mother of decedent's son is Mr. Johnson's assignee and the named party who is to benefit therefrom.

against those groundless, false, or fraudulent claims regardless of the insurer's ultimate liability to pay. *D'Auria v. Zurich Insurance Co., supra* at 234, 507 A.2d at 859.[9]

(2) It is not the actual details of the injury, but the nature of the claim which determines whether the insurer is required to defend, and that duty is limited to only those claims covered by the policy. *D'Auria v. Zurich Insurance Co., supra,* at 234, 507 A.2d at 859. The insurer is obligated to defend if the factual allegations of the complaint, on its face, comprehend an injury which is actually or potentially within the scope of the policy. *Cadwallader v. New Amsterdam Casualty Co.,* 396 Pa. 582, 590, 152 A.2d 484, 489 (1959); *Unionamerica Insurance Company Ltd. v. J.B. Johnson,* 806 A.2d 431 (Pa. Super. 2002); *Scopel v. Donegal Mutual Insurance Co.,* 698 A.2d 602 (Pa. Super. 1997); *American States Insurance Co. v. Maryland Casualty Co.,* 427 Pa. Super. 170, 628 A.2d 880 (1993); *Stidham v. Millvale Sportsmen's Club,* 421 Pa. Super. 548, 618 A.2d 945 (1992), *appeal denied,* 536 Pa. 630, 637 A.2d 290 (1993) (table) (even though the insured shot and killed a person and pled guilty to third-degree murder, the insurer still had a duty to defend the civil case against the insured because:

9. Indeed, the subject homeowner's policy provides that, if suit were brought for bodily injury caused by an occurrence, Penn National would provide a defense to the insured at its own expense, even if the suit were "groundless, false or fraudulent." (Trial exhibit P-D, policy—p. 12 of 18, vol. I.) Penn National asserted denial of coverage on grounds that coverage was excluded for bodily injury "which is expected or intended by the insured" merely on grounds of averments in a complaint which Penn National alone self-servingly and unilaterally deemed not to plead negligence despite its being shot through with allegations of Mr. Johnson's negligent conduct. (Trial/hearing exhibit P-B, p. 15, vol. I.)

(1) the civil complaint against the insured alleged negligent, careless, reckless, and/or willful conduct, and (2) evidence established that the insured was intoxicated at the time of the shooting incident and therefore, could not form the mens rea with which to intentionally commit the crime).

In the instant case, the record reflects that the prosecutor and the court accepted Mr. Johnson's plea to imperfect self-defense which involved an unreasonable belief that deadly force was necessary to reduce the threat the decedent posed to his and his uncle's well-being, and recommended a sentence of five to 10 years instead of life. The vast discrepancy between the sentence that could have been issued and the one Mr. Johnson received and, indeed, has since served, raises the inference that the district attorney believed Mr. Johnson's claim that the shooting was unintentional. Such evidence also raises an inference that Mr. Johnson could not have possessed the mens rea of rational intentionality to commit it, as well in the heated and overwrought circumstances in which it occurred. The arbitrator subsequently accepted Mr. Johnson's evidence that the gun he was holding accidentally went off during a physical altercation in which Mr. Johnson had sustained a broken nose and other injuries while his uncle was lying unconscious on the ground after being pistol whipped and knocked out by the decedent.

Given that Penn National, despite notice, studiously took no part in, nor timely sought to protect its rights during the prior adjudication of negligence in the underlying case in which the same evidence presented sub judice was determined against it, any claim by Penn National that the intoxication referred to in *Stidham* and

the unreasonability of Mr. Johnson's belief that a gun was necessary to save his own and his uncle's life is deemed to be a distinction without a difference.

(3) In *D'Auria v. Zurich Insurance Co., supra,* the Pennsylvania Superior Court held that, "The major difference between indemnity and [a] duty to defend cases is that in the latter, the complaint is the sole guide to the facts." *D'Auria v. Zurich Insurance Co., supra* at 236, 507 A.2d at 860. "It does not matter if, in reality, the facts are completely groundless, false, or fraudulent. It is the face of the complaint and not the truth of the facts alleged therein which determines whether there is a duty to defend." *D'Auria v. Zurich Insurance Co., supra* at 235, 507 A.2d at 859. An insurer's duty to defend and indemnify the insured may be resolved *via* declaratory judgment actions. *Erie Insurance Exchange v. Claypoole,* 449 Pa. Super. 142, 673 A.2d 348 (1996); *Aetna Casualty and Surety Company v. Roe,* 437 Pa. Super. 414, 650 A.2d 94 (1994); *Harleysville Mutual Insurance Co. v. Madison,* 415 Pa. Super. 361, 609 A.2d 564 (1992); *Uguccioni v. USF&G,* 408 Pa. Super. 511, 597 A.2d 149 (1991). In such actions, the allegations raised in the underlying complaint alone fix the insurer's duty to defend. *Aetna Casualty and Surety Company v. Roe, supra* at 422, 650 A.2d at 98; *Germantown Insurance Co. v. Martin,* 407 Pa. Super. 326, 595 A.2d 1172 (1991), *alloc. denied,* 531 Pa. 646, 612 A.2d 985 (1992); *United Services Automobile Association v. Elitzky,* 358 Pa. Super. 362, 517 A.2d 982 (1986), *alloc. denied,* 515 Pa. 600, 528 A.2d 957 (1987).

The duty to defend, however, is not activated by every allegation raised against the insured. *D'Auria v. Zurich Insurance Co., supra.* The nature of the allegations them-

selves, not the details surrounding the injuries suffered, are the basis upon which the insurer's duty to defend the insured arises. *D'Auria v. Zurich Insurance Co., supra* at 234, 507 A.2d at 859. Thus, the allegations contained within the underlying complaint pertaining to injuries which are either actually or potentially within the scope of the insurance policy obligate the insurer to defend the insured. *Aetna Casualty and Surety Company v. Roe, supra,* 437 Pa. Super. at 422, 650 A.2d at 99. The court finds that Penn National's self-serving conclusions regarding the averments in the complaint and denial outright of coverage without investigating or looking into the allegations, as well as failing to conduct a sufficient and thorough perusal of the applicable law, was irresponsible, reprehensible, in violation of the standards of the insurance industry, and in bad faith derogation of the interests of the insured.

(4) Penn National urges adoption of its own version of the Commonwealth's inferred intent rule to support its unilateral finding of intentionality on the part of Mr. Johnson so as to support its expedited denial of coverage based upon a self-serving reading of the allegations in the complaint and after the discovery of Mr. Johnson's guilty plea. As it were, Penn National itself inferred Mr. Johnson's intent to shoot the decedent from a reading of merely two words in the complaint: "four shots". However, to date, Pennsylvania allows intent to be inferred from the character of an insured's acts solely in cases involving the sexual molestation of children and the sale of heroin. *Minnesota Fire & Casualty Co. v. Greenfield,* 805 A.2d 622 (Pa. Super. 2002); *Aetna Casualty and Surety Company v. Roe, supra.* See also, *Wiley v. State Farm Fire and Cas. Co.,* 995 F.2d 457 (3d Cir. 1993)

(predicting that the Pennsylvania Supreme Court would adopt and apply the inferred intent rule, as opposed to the subjective standard of determining intent from the standpoint of the insured, in the exceptional case of sexual child abuse by an insured adult).

(5) With regard to the acceptability of the arbitrator's decision, it is the law of this Commonwealth that a conviction in a prior criminal proceeding cannot preclude a victim from litigating the issue of the insured actor's intent where a determination of intent was not essential to the conviction, nor, under the circumstances presented here, either not decided by a jury or was ambiguous. *State Farm Fire and Casualty Co. v. Dunlavey,* 187 F. Supp.2d 183, 188 (E.D. Pa. 2001) (interpreting Pennsylvania law and citing to *Stidham v. Millvale Sportsmen's Club, supra.* Since the case of *Aetna Casualty and Surety Company v. Roe, supra,* was decided, the inferred intent rule has not been applied to the conduct under consideration here. Indeed, the Third Circuit Court of Appeals cautioned in *Wiley v. State Farm Fire and Cas. Co., supra,* that, "in cases that do not involve sexual child abuse [and the sale of heroin], Pennsylvania has adopted a general liability standard for determining the existence of specific intent that looks to the insured's actual subjective intent." *Wiley v. State Farm Fire and Cas. Co., supra,* 995 F.2d at 460.

(6) The court in *Aetna Life and Casualty Co. v. Barthelmy,* 33 F.3d 189 (3d Cir. 1994) declined to extend the inferred intent rule to preclude coverage for an alleged date rape where insured subjectively believed he had the victim's consent. The rationale of the *Barthelmy* court in reaching that conclusion is instructive on the issues before this court:

"Were it true that any potential criminal liability would give rise to an inferred intent to harm and, thereby, exclude coverage under a homeowner's policy, we would not have emphasized in *Wiley* that sexual abuse of a child is a uniquely harmful act calling for the narrowly applied inferred intent rule. We simply would have concluded that, because child molestation is a crime, intent to harm must be inferred as a matter of law. Instead, we recognized in *Wiley* that subjective intent generally is relevant, even when the insured has pleaded guilty to a crime. 995 F.2d at 466-67; see *Stidham v. Millvale Sportsmen's Club,* 421 Pa. Super. 548, 618 A.2d 945 (1992) (holding that, because insured's intent to harm remained a material factual issue, summary judgment was inappropriate, notwithstanding the act that insured shot and killed a stranger in an alcoholic blackout and pleaded guilty to third-degree murder)." *Aetna Life and Casualty Co. v. Barthelmy, supra,* 33F.3d 192-93.

The prosecutor in Mr. Johnson's case clearly believed that Mr. Johnson's subjective belief that he needed deadly force was not within the confines of human reason. All charges, except voluntary manslaughter based on "imperfect" self-defense, were dismissed. The guilty plea colloquy and record are replete with references to Mr. Johnson's unreasonable belief that deadly force was necessary to save himself and his uncle, whom Mr. Toler had beaten unconscious laying on the ground. Evidence from the coroner, while compelling, failed to establish that the shots that struck Mr. Toler were not accidentally released, nor that they were not fired in a struggle. The coroner said that it was the shot to Mr. Toler's mid-back that was the most lethal and Mr. Johnson testified that this was the third shot fired acciden-

tally from the gun. Therefore, even if it were shown that the second or third shot had been fired intentionally, one or two previous non-deadly shots delivered unintentionally would bring this matter squarely within the holding in *Erie Insurance Exchange v. Muff,* 851 A.2d 919 (Pa. Super. 2004), which held that a first-degree murder conviction, even by a jury, did not obviate a duty to defend where there were discrete acts and elements of negligence preceding that crime pleaded within the four corners of the complaint. In short, Mr. Johnson's intent to commit the crime with which he was charged remained a factual issue that could be determined by the arbitrator. Therefore, Penn National's legal review of Ms. Cox-Harris' claim was incomplete and cursory, and its legal officer's advice to deny Mr. Johnson coverage on the basis thereof was in bad faith derogation of his interests.

(7) In insisting that Mr. Johnson's guilty plea to third-degree murder should result in automatic judgment in its favor in this action, Penn National asserts that there was no need for this court to consider the arbitrator's decision on the merits of the criminal case. However, in *Stidham v. Millvale Sportsmen's Club, supra,* the Superior Court held that a guilty plea in criminal proceedings cannot substitute for a declaratory judgment action because all indispensable parties were not involved in that proceeding. *Stidham v. Millvale Sportsmen's Club, supra,* 421 Pa. Super. at 565, 618 A.2d at 954. Thus, under the law and the circumstances sub judice, Duane Johnson's negotiated guilty plea to a third-degree murder charge did not prevent deliberation by the arbitrator of the evidence by which it was determined that Mr. Johnson's actions had been grounded in negligence and that he did not

intentionally shoot Sami Toler. *Id., supra.* Moreover, a discounting of the arbitrator's decision is allowed only where there existed a reasonable basis for the denial of coverage and, in this case, there clearly was none. *Wilson v. Maryland Casualty Co.,* 377 Pa. 588, 105 A.2d 304 (1954); *Vaksman v. Zurich General Accident and Liability Insurance Co.,* 172 Pa. Super. 588, 94 A.2d 186 (1953).

(8) Where a claim is potentially within the scope of an insurance policy, the insurer who refuses to defend at the outset does so at its own peril. *Cadwallader v. New Amsterdam Casualty Co., supra; Stidham v. Millvale Sportsmen's Club, supra.* In *Stidham,* the Pennsylvania Superior Court held that a declaratory judgment action, though not specifically required by law, might resolve, at the outset, the question of an insurer's duty to defend. *Stidham v. Millvale Sportsmen's Club, supra,* 421 Pa. Super. at 565, 618 A.2d at 954. The purpose of a declaratory judgment procedure is to furnish an expeditious remedy for the settlement of claims which implicate imminent and inevitable litigation and to provide practical help in settling controversies which could be determined more advantageously if settled promptly rather than at some future time when they would require adjudication. *Eureka Casualty Co. v. Henderson,* 371 Pa. 587, 92 A.2d 551 (1952).

In addition, a declaratory judgment action provides a forum for all persons asserting claims on the issue of coverage between the insured and the insurer. *Stidham v. Millvale Sportsmen's Club, supra.* In order to determine whether Penn National had a duty to defend Duane Johnson, it was necessary to compare the terms of the subject insurance policy with the nature of the allegations

of the Cox-Harris complaint to determine whether, if the allegations were true, Penn National might be obligated to provide coverage. It has already been shown that Penn National's reading of the complaint was utterly self-serving and, indeed, incorrect under the applicable law and thus, Penn National's belief in the decision's correctness was likewise unreasonable. Therefore, the court was required to accept the decision of the arbitrator that Mr. Johnson's conduct in the shooting incident was negligent because the law necessitated an initial finding that Penn National's decision to decline coverage was reasonably based ab initio before any subsequent forum's determination of an insured's negligence could be disregarded. *Wilson v. Maryland Casualty Co., supra; Vaksman v. Zurich General Accident and Liability Insurance Co., supra.*

(9) Penn National declined coverage of the claims made by Ms. Cox-Harris against Mr. Johnson on grounds of an exclusion for bodily injury or property damage "which is expected or intended by the insured." Pennsylvania courts have construed insurance policy provisions excluding coverage for "expected or intended injuries" in other disputes and, after a thorough exegesis of the "expected or intended harm" clause, the Pennsylvania Superior Court has held that these clauses are ambiguous as a matter of law and must be construed against the insurer. *Stidham v. Millvale Sportsmen's Club, supra,* 421 Pa. Super. at 563, 618 A.2d at 953; *United Services Auto Association v. Elitzky, supra,* 358 Pa. Super. at 377, 517 A.2d at 989; *Germantown Insurance Co. v. Martin, supra,* 407 Pa. Super. 326, 595 A.2d 1172; *Donegal Mutual Insurance Co. v. Ferrara, supra,* 380 Pa. Super. at 592, 552 A.2d at 702. In *Stidham,* the Superior

Court also held that the words "expected" and "intended" are synonymous when interpreting insurance exclusionary clauses, writing that "an insured intends an injury if [he/she] desired to cause the consequences of [his/her] act or if [he/she] acted knowing that such consequences were substantially certain to result." *Stidham v. Millvale Sportsmen's Club, supra,* at 563, 618 A.2d at 953. In *Minnesota Fire and Casualty Co. v. Greenfield,* 805 A.2d 622 (Pa. Super. 2002), the defendant, Mr. Greenfield, had pleaded guilty to charges of involuntary manslaughter, abuse of a corpse, and delivery of a controlled substance after selling heroin to the victim who later died. While the voluntary manslaughter charge involved elements of recklessness and negligence, the statutes governing the additional charges against Mr. Greenfield did not. The victim's parents sued the defendant for "wrongful actions, neglect and negligence" leading to the death of their daughter, and the defendant's insurer, Minnesota Fire and Casualty Company, brought a declaratory judgment action seeking a determination that it was not required to defend or indemnify Mr. Greenfield in the civil suit. The Pennsylvania Superior Court applied the inferred intent rule to the sale of heroin and deemed the heroin sale to have been the initial intentional act that led to the victim's death and not the insured's negligently having left her alone to die.

Here, Duane Johnson testified that the third accidental shot was to the decedent's lower back, which the coroner indicated was the most lethal wound. (3/1/06 N.T. 93, 219.) Further, Mr. Johnson made it a matter of record at the guilty plea hearing that the shooting was unintentional and the district attorney allowed for him to plead to a lesser charge reflecting a mitigated intent in com-

mission of the crime. While public policy would seem to dictate that the intentionality requirement of third-degree murder and/or the fact of a criminal charge and/or conviction encompassing alleged "expected or intended" acts of an insured, the cases dictating that policy do not encompass the chain of separate and discrete actions on Mr. Johnson's part that led to the Sami Toler's death. See *e.g., Erie Insurance Exchange v. Fidler,* 808 A.2d 587 (Pa. Super. 2002); *State Farm Mutual Insurance Co. v. Martin, supra; Germantown Ins. Co. v. Martin, supra; Donegal Mutual Insurance Co. v. Ferrara, supra; State Farm Fire and Casualty Co. v. Cooper,* 2002 WL 1287574 (E.D. Pa. 2001) (memorandum opinion interpreting Pennsylvania law); *West American Insurance Company v. Klein,* 1998 WL 351576 (E.D. Pa. 1998) (memorandum opinion interpreting Pennsylvania law); *General Accident Insurance Co. v. Ciafra,* 36 D.&C.4th 385 (Phila. Cty. 1998); *Erie Insurance Exchange v. Fry,* 39 D.&C.4th 20 (Mercer Cty. 1998).

The United States District Court of the District of New Mexico dealt with a scenario that is somewhat similar in nature to this action in the case of *State Farm & Casualty Co. v. Ruiz,* 36 F. Supp.2d 1308 (1999). There, the plaintiff homeowner's insurer commenced a declaratory judgment action wherein the district court found a duty to defend an insured in an underlying wrongful death action arising from the death of a child where allegations in the underlying complaint were ambiguous as to whether the child had died as a result of accidental or intentional injuries inflicted by the insured. In the instant action, the shooting that led to Duane Johnson's conviction for third-degree murder is asserted as the injury, but the contentions all sound in negligence,

thereby inserting questions as to the nature of other conduct by Mr. Johnson against the deceased.

Penn National merely assumed from reading that four (actually three) shots had killed the decedent and from knowledge of the guilty plea that Mr. Johnson's acts were intentional, without more. Penn National thus had no knowledge of the full circumstances of the criminal case, including the issue of self-defense and its ramifications that resulted in the filing of a much lesser charge, which required some presumption on the prosecutor's part that some or all of the shots fired were accidental in nature. The court in *State Farm & Casualty Co. v. Ruiz, supra,* while recognizing the potential for "artful if not deceptive pleading to bring a complaint within the coverage of an insurance policy," found a duty to defend based upon the conclusion that the statute under which Patrick Ruiz was convicted left room for the possibility that he acted with gross negligence and not with the intent to injure or kill his son, and that the allegations in the complaint did not clearly plead facts inconsistent with an accident or eliminating the possibility that the victim's injuries were not intended. *State Farm Fire & Casualty Co. v. Ruiz, supra,* 36 F. Supp.2d at 1315.

Although the coroner testified that all of the bullets that struck Mr. Toler had been to the back, he was not questioned as to whether the rightward and leftward trajectories of the shots to the left shoulder and mid-back could have been inflicted in a struggle, although he did say that the bullet to the shoulder could have come from above. Mr. Johnson testified before this court that the first shot was to the upper shoulder, the second to the rear thigh and the third shot was to the mid back. (3/1/06 N.T. 216-20.) The coroner testified that the shot to the

mid lower back was the most lethal, and Mr. Johnson testified that this wound was sustained when decedent was hit by the third shot. In *Erie Insurance Exchange v. Muff, supra,* the Superior Court affirmed this court's finding that the pleading of separate and discrete acts of negligence occurring before the act which caused the defendant to be charged and convicted of first-degree murder were deserving of a defense by her insurer. Therefore, both in *Ruiz, Muff,* as well as in the action sub judice, the allegations pleaded in the underlying complaint were potentially within the liability insurance coverage of the subject policy because there were negligent acts which preceded the act that caused injury or death to the victim.

(10) While an insurer is not required to defend a claim when it is apparent from the face of the complaint that none of the allegations potentially falls within the coverage of the policy, in cases in which the complaint alleges both conduct that potentially comes under the policy and conduct that does not, the insurer must defend the entire action. *Cadwallader v. New Amsterdam Casualty Co., supra,* 396 Pa. at 590, 152 A.2d at 489. The Cox-Harris complaint alleges only negligent conduct, which allegations in and of themselves would ordinarily require a defense to this action. Penn National, however, urges an inferred intent rule arising from the alleged "four shots" and knowledge of the guilty plea, neither of which has been adopted in this Commonwealth as the basis thereof. In cases not involving child sexual abuse and the sale of heroin, Pennsylvania's general liability standard for determining the existence of intentionality looks to the insured's actual subjective intent, which is the standard which should be implemented in determining in this case

whether or not the policy requires a duty to defend. *Titan Indemnity Company v. Cameron*, 2002 WL 1774059 (E.D. Pa. 2002) (interpreting Pennsylvania law). It was established in the criminal case that Mr. Johnson possessed an unreasonable or irrational belief that deadly force was necessary to protect himself and his unconscious uncle. There clearly has been no adoption of an inferred intent rule disallowing coverage under the circumstances presented here. Even though Duane Johnson was convicted of third-degree murder, the allowance for accidental infliction of the shots that killed the decedent can be presumed from the fact that he received a prison sentence of from five to 10 years under the circumstances of this shooting, instead of a life term. Finally, since it was the third and not the first two shots that led to Mr. Toler's death, it is the considered opinion of this court that, under Pennsylvania law, the plaintiff owes a duty to both defend and indemnify Duane Johnson for the damages awarded by the arbitrator in the underlying action. *Erie Insurance Exchange v. Muff, supra; Unionamerica Insurance Co. Ltd. v. J.B. Johnson, supra* (duty to indemnify is conditional obligation which arises if, after trial on third-party claim, it is determined that the loss suffered is covered by the policy). *Erie Insurance Exchange v. Transamerica Insurance Co., supra,* 516 Pa. at 583, 533 A.2d at 1368 (duty to defend exists until such time as claim is confined to a recovery the policy does not cover).

(11) The principles governing the interpretation of a contract of insurance are familiar and well settled. The task of interpreting a contract is generally performed by a court rather than by a jury. *Gonzalez v. United States Steel Corporation,* 484 Pa. 277, 398 A.2d 1378 (1979).

The goal of that task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument. *Mohn v. American Casualty Co.,* 458 Pa. 576, 326 A.2d 346 (1974). Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. *Mohn v. American Casualty Co., supra.* The issue in this case involves the proper construction of an insurance policy which is resolved as a matter of law in a declaratory judgment action.

(12) The court finds that Mr. Johnson and Ms. Cox-Harris have shown by clear and convincing evidence that Penn National's conduct in denying coverage to Mr. Johnson was in breach of the subject contract of insurance in bad faith, requiring it to pay compensatory damages for the breach. *Birth Center v. St. Paul Companies Inc.,* 567 Pa. 386, 787 A.2d 376 (2001); *Terletsky v. Prudential Property and Casualty Insurance Company,* 437 Pa. Super. 108, 649 A.2d 680 (1994). The Pennsylvania Bad Faith Statute, 42 Pa.C.S. §8371 provides that, where an insurer has acted in bad faith, the insured may be awarded punitive damages, interest at the prime rate plus 3 percent and court costs and attorney fees against the insurer. Bad faith exists where the insurer did not have a reasonable basis for denying benefits under the policy and where the insurer knew of, or recklessly disregarded, its lack of reasonable basis in denying coverage. *Terletsky v. Prudential Property and Casualty Insurance Company, supra.* Bad faith of an insurer is a frivolous or unfounded refusal to pay the proceeds of a policy. *Id., supra.* The movant asserting the claim must prove bad faith by clear and convincing evidence by showing: (1) the insurer did not have a reasonable basis

for denying benefits under the policy; and (2) the insurer knew or recklessly disregarded its lack of reasonable basis in denying the claim. *Id., supra.* Where an insurer's evaluation of a claim is less than honest, intelligent and objective, the insurer can be held liable for bad faith. *Cowden v. Aetna Casualty and Surety Co.,* 389 Pa. 459, 134 A.2d 223 (1957). This court finds that Penn National breached this contract of insurance in bad faith for the failure to establish a reasonable basis for its denial of coverage to the insured, Mr. Johnson. *Hollock v. Erie Insurance Exchange,* 842 A.2d 409 (Pa. Super. 2004).[10]

(13) Accordingly, the imposition of punitive damages is appropriate. The size of a punitive damages award must be "reasonably related" to the state's interest in punishing and deterring particular behavior and not the product of arbitrariness or unfettered discretion. *Hollock v. Erie Insurance Exchange, supra,* 842 A.2d at 419. Under Pennsylvania law, punitive damage awards are evaluated on the basis of three factors: (1) the character of the defendant; (2) the nature and extent of harm done to the plaintiff; and (3) the wealth of the defendant. *Pioneer Commercial Funding Corp. v. American Financial Mortgage Corporation,* 797 A.2d 269, 290 (Pa. Super. 2002). In the instant case, the character of Penn National's actions were at best offensive, but at worst repulsive. In addition to exhibiting virtually total disregard of the standards and practices of the insurance industry,

---

10. The court recalls and notes here as well that, following its denial of coverage, and at a most vulnerable time in Mr. Johnson's and his family's lives, Penn National added insult to injury by cancelling Mr. Johnson's coverage on the basis of the purported heightened risks of his prior *negligent* conduct.

Penn National continually and willfully ignored its fiduciary responsibilities to its insured. (See the court's findings of fact, paragraphs 7-10 hereof, inclusive, *supra*.) The nature and extent of harm done to Duane Johnson was financially ruinous, to wit, $2,490,666. Finally, Ms. Cox-Harris has presented extensive unrebutted evidence of the tremendous wealth of Penn National which compels the conclusion that only a substantial punitive damages award would register in Penn National's corporate conscience. The court has concluded, based upon its experience of having seen and heard the totality of the evidence in the instant case, that $6,000,000 is the appropriate amount of punitive damages following determination of the harm caused by Penn National, its wealth, and the likelihood that this amount will punish and deter Penn National and deter other insurers in the same position from acting in a similar fashion in the future.

(14) In conclusion, having reviewed the record and the evidence and the briefs, memoranda and proposed findings of fact and conclusions of law submitted by the parties and following a hearing, this court concludes that the unique factual scenario of this case and the applicable law of the Commonwealth required this court to impose upon Penn National Insurance Company a duty to both defend and indemnify its insured, Duane Johnson, and awards the damages against Penn National hereinabove set forth in the court's declaratory judgment order in favor of Mr. Johnson's assignee, Ms. Cox-Harris, as representative of the decedent's estate and as the parent and natural guardian of her son with the decedent.