595 A.2d 1172

GERMANTOWN INSURANCE COMPANY, Appellant,

v.

Russell MARTIN, Administrator of the Estate of Robert Martin Deceased and Russell Martin and Florence Martin his Wife and Edward Van Kirk.

Superior Court of Pennsylvania.

Argued April 17, 1991.

Filed July 26, 1991.

Reargument Denied Sept. 27, 1991.

Richard Rubin, Philadelphia, for appellant.

Paul R. Beckert, Jr., Bensalem, for Van Kirk, appellee.

Before MONTEMURO, BECK and TAMILIA, JJ.

TAMILIA, Judge:

This is an appeal from a declaratory judgment Order entered June 11, 1990 against appellant, Germantown Insurance Company, and in favor of appellee, Edward Van Kirk, resulting in an award of $100,000. The tragic circumstances of the underlying case have been exacerbated by the trial court's misapplication of the relevant legal standards as a means of providing relief to an innocent and injured victim of senseless violence. We reverse.

Our review of the record discloses the unfolding of the following scenario. On May 26, 1986, Robert Martin, age 25, entered the Trynoski home in Levittown, Pennsylvania, and, in a shooting spree that lasted only a matter of seconds, killed two people and gravely wounded another, Van Kirk. For approximately one year before the shootings, Martin had been dating Cindy White steadily, and, in fact, the two were engaged to be married until several weeks before the shootings when the relationship ended abruptly and White returned to her former boyfriend, Jeffrey Trynoski. Martin's best friend, Kevin Duffy, later testified Martin was upset White had left him and returned to a boyfriend and lifestyle of which he strongly disapproved. Martin's distress was apparent both to his parents and to Duffy. To compound an already bad situation, in the weeks between their breakup and the shootings, White regularly telephoned Martin, harassing him and upsetting him, and ultimately leaving him "fed up." A week prior to the shootings, Martin told Duffy he wanted "to go over there and just start shooting and kill everybody in the [Trynoski] house." Duffy talked him out of his plan at that time and informed White of Martin's intention to shoot her.

On the morning of May 26, 1986, Martin obtained a 9mm automatic handgun from his gun collection, loaded the weapon and, taking two extra 9mm ammunition clips, at approximately 9:00 a.m. drove his car to the Trynoski home. Martin knocked at the door and as Anthony Trynoski, Jeffrey's brother, opened the door, Martin fired two shots at point blank range into Anthony's chest, killing him.

Martin then entered the living room where Van Kirk, a boarder, was lying on the couch. Martin stared at Van Kirk, raised his gun, and from a distance of about fifteen feet, fired a single shot into Van Kirk's chest, followed a moment later by three more shots into Van Kirk's chest. As Van Kirk was falling into unconsciousness, he heard Martin call out Jeffrey's name, and at that time, Martin sighted Rosemarie Trynoski approaching and fired two shots to her head and chest, killing her. Unable to find Cindy White or Jeffrey Trynoski, who were hiding, Martin left the house and returned to his car. Martin then drove several miles to a secluded roadway where he parked, leaving his car to sit on a curb, killing himself by firing a shot into his own head.

Until the time of the shootings, Martin led a normal life marked by no noteworthy or untoward incidents. He was a high school graduate and better than average student. He was employed as a printing press operator and had no disciplinary problems at work, nor did he have a history of psychiatric or significant physical problems. Martin lived at home with his parents, owned a gun collection, and was an avid hunter and a frequent target shooter.

On or about September 10, 1987, Van Kirk filed an action in trespass against Martin's estate, alleging Martin "[a]ccidentally, negligently or inadvertently" fired the shots which caused Van Kirk's injuries. On November 9, 1987, Germantown, as underwriter of Martin's parents' personal liability/homeowner's insurance policy, under which Martin was insured, filed an action for declaratory judgment to determine the existence or nonexistence of insurance coverage for Van Kirk's injuries. Specifically, Germantown cited the portion of the homeowner's policy which excluded personal liability and medical payments to others for bodily injury or property damage "which is expected or intended by the insured."

A hearing was held in this matter on May 1, 1989, dealing with the issue of whether Germantown had a duty to defend. Germantown presented various portions of the

pleadings, the homeowner's policy, testimony by Kevin Duffy, the victims' medical records, police records and depositions of Martin's father and Van Kirk. Appellee relied solely on the testimony of Van Kirk, and no expert medical testimony was offered by any party. On June 29, 1989, the trial court entered a declaratory judgment Order that Germantown was required to defend Martin's estate under the provisions of its homeowner's policy, finding that Martin was deranged at the time of the shootings under the "irrational impulse" test for mental capacity.[1] On July 10, 1989, Germantown filed a motion for post-trial relief, requesting, *inter alia*, that the trial court delete its finding of fact that:

We have concluded that the surrounding events are so bizarre that the decedent, Martin, must have been acting from an enraged or a mentally disturbed state of mind under which he was totally incapable of forming any specific intent with reference to Van Kirk.

Germantown also requested that declaratory judgment be entered in its favor.

On November 20, 1989, the parties agreed to a stipulated verdict of $100,000, the policy limit, in favor of Van Kirk if the pending declaratory judgment action determined Van Kirk was entitled to recover the proceeds of the policy. A stipulated Order dated November 21, 1989 deferred a final decision concerning the rights and liabilities of the parties until a hearing could be held to present additional testimony concerning Martin's mental state at the time of the shootings. A hearing was held on June 11, 1990 on the sole issue of Martin's competency. Conflicting testimony was

1. The trial court derived the "irrational impulse" test from the New Jersey case *Ruvolo v. American Casualty Co.*, 39 N.J. 490, 189 A.2d 204 (1963). The *Ruvolo* Court articulated its test for mental capacity as follows:

We hold that if the insured was suffering from a derangement of his intellect which deprived him of the capacity to govern his conduct in accordance with reason, and while in that condition acting on an irrational impulse, he shot and killed Dr. LeFace, his act cannot be treated as "intentional" within the connotation of defendant's insurance contract.

*Id.* at 498, 189 A.2d at 209.

presented, not surprisingly, by expert witnesses for the parties. Robert Sadoff, M.D., a forensic psychiatrist called as a witness by Germantown, testified that it was his medical opinion, based upon the medical and police reports, and the May 1, 1989 hearing transcripts, that Martin was not mentally ill at the time of the shootings, that he knew the nature and quality of his actions, and that he intended the consequences which resulted. Van Kirk's expert witness, Perry Berman, M.D., also a psychiatrist, testified that his medical opinion was that Martin was suffering from some derangement in his thinking which deprived him of the capacity to govern his conduct in accordance with reason and while in that condition acted on an irrational impulse.

On June 11, 1990, the trial court entered the final judgment which forms the basis of this appeal, finding in favor of Van Kirk and against Germantown, in the amount of $100,000. In so doing, the trial court reiterated its earlier finding that Martin acted under an "irrational impulse" and thus could not have intended his actions within the meaning of the excluded coverage provisions of the homeowner's policy.

As an initial consideration, the obligation of Germantown to defend an action against Martin's estate is fixed solely by the allegations in the underlying complaint filed by Van Kirk. As long as the complaint comprehends an injury which may be within the scope of the policy, Germantown must defend Martin's estate until the claim is confined to a recovery the policy does not cover. *United Services Automobile Association v. Elitzky*, 358 Pa.Super. 362, 517 A.2d 982 (1986), *alloc. denied*, 515 Pa. 600, 528 A.2d 957 (1987) (citations omitted). To make such a determination, we must interpret the insurance contract and the pertinent provisions thereof, bearing in mind the construction of a writing is a question of law in which this Court need not defer to the finding of the trial court. *Id.*

In this case, we are concerned only with the excluded coverage portions of the policy, more specifically the stock

phrase concerning damage which is "expected or intended by the insured." The policy contains the following provision:

1. **Coverage E—Personal Liability and Coverage F— Medical Payments to Others** do not apply to **bodily injury** or **property damage:**

 a. which is expected or intended by the insured....

In a thorough and well reasoned Opinion, a panel of this Court in *Elitzky* examined the history of exclusionary clauses and the resulting case law in Pennsylvania and other jurisdictions and held exclusionary clauses for "expected or intended" damage, as a matter of law, are ambiguous and must be construed against the insurer, but the terms "expected or intended" are synonymous for purposes of insurance exclusionary clauses. The *Elitzky* Court further held "such a clause excludes only injury and damage of the same general type which the insured intended to cause. An insured intends an injury if he desired to cause the consequences of his act or if he acted knowingly that such consequences were substantially certain to result." *Id.*, 358 Pa.Superior Ct. at 375, 517 A.2d at 989. *See Donegal Mutual Life Insurance Co. v. Ferrara,* 380 Pa.Super. 588, 552 A.2d 699 (1989); *State Farm Fire and Casualty Co. v. Levine,* 389 Pa.Super. 1, 566 A.2d 318 (1989).

 Applying the *Elitzky* standards to the facts of the case before us, we find Martin's conduct on the morning of May 26, 1986 is excluded under the terms of the homeowner's policy with Germantown as it is exactly the type of injury against which insurance companies are not and should not be expected to insure. Martin, one week before the shootings, expressed to his best friend his desire to "just start shooting and kill everyone in the [Trynoski] house." On May 26, 1986, Martin nearly did just that. Having already mortally wounded Anthony Trynoski, Martin turned toward Van Kirk, looked at him, and rapidly but not wildly fired four bullets at close range into Van Kirk's chest. Martin then shot and killed Rosemarie Trynoski. Martin was not intoxicated or under the influence of any

drug at the time of the shootings. Clearly, these shots from a man proficient with weapons were intended to cause the injuries which resulted to Van Kirk. The evidence that Martin chose an automatic handgun, brought extra ammunition, drove to the right house, approached without incident and shot repeatedly each person he saw leads us inescapably to the conclusion Martin expected or intended to cause serious harm to the inhabitants of the Trynoski home. We find no evidence that the shooting was accidental or negligent and it is of no consequence that Van Kirk's identity or presence in the house were unknown to Martin. Intent may be transferred from an intended victim to another. *Nationwide Mutual Ins. Co. v. Hassinger*, 325 Pa.Super. 484, 473 A.2d 171 (1984).

■ While we find coverage to Martin's estate excluded under the terms of the homeowner's policy, we would also find coverage excluded as violative of the public policy of Pennsylvania. *Hassinger, supra; Elitzky, supra.* The courts of Pennsylvania have refused to require an insurer to defend an insured for his own intentional torts and/or criminal acts. *Wilson v. Maryland Casualty Co.,* 377 Pa. 588, 105 A.2d 304 (1954); *Esmond v. Liscio,* 209 Pa.Super. 200, 224 A.2d 793 (1966). The trial court would extend the law of Pennsylvania beyond anything heretofore and would impose an interpretation on homeowner policies far beyond what was intended by the parties. To permit the trial court decision to stand would effectively negate existing sound public policy.

■ We believe the learned trial court, were it to have employed the same analysis as this Court, would undoubtedly have reached a similar conclusion. The trial court, however, was so dismayed by the "bizarre" events that it found Martin's acts the product of an enraged or mentally disturbed state of mind under which Martin was totally incapable of forming any specific intent to harm Van Kirk. In doing so, he applied the "irrational impulse" test to this case and, thereby, confused rational conduct with intentional conduct. That Martin's acts were senseless, irrational and incomprehensible to the trial court or anyone else has

no bearing on determining coverage under the policy. The record before us discloses Martin brought about the harm he intended. Obviously, no rational person would go on a shooting spree, but this in no way lessens the intentional character of the conduct, if such intent is evidenced.

As a final matter, we agree with Germantown that to the extent an insanity standard is relevant to this case, the *M'Naghten* Rule rather than the "irrational impulse" test is the applicable standard in civil and criminal matters.[2] As occurred in this trial, once the court moves beyond the clear meaning of the policy and delves into the subjective state of mind or rationality of the actor, it becomes a contest between psychiatric experts, one of whom can be found to testify on any position. The psychiatric testimony in this case appears to be irrelevant to the issue of coverage for purposes of Germantown representation.[3]

For the foregoing reasons, we find the trial court erred in entering declaratory judgment in favor of Van Kirk and against Germantown, and we vacate the Order of the trial court. This Opinion is dispositive of the sole issue in this case and requires no further proceeding as Germantown is not required to defend the policy holder and has no legal responsibility for the actions of Martin, which are not covered by the homeowner's policy.

Order reversed; judgment vacated.

Jurisdiction relinquished.

Concurring opinion by BECK, J.

**2.** As provided in the Crimes Code, "the phrase 'legally insane' means that, at the time of the commission of the offense, the actor was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or, if the actor did know the quality of the act, that he did not know that what he was doing was wrong." 18 Pa.C.S. § 315(b).

**3.** It is incredible that the Concurring Opinion by Judge Beck considers discussion of the *M'Naughten* rule to be dicta when it relates to an argument proposed by appellant which, in effect, was the lynch pin of its allegation that irrational impulse, as adopted by the trial court, can not be a standard for any diminished capacity by way of insanity in the face of the *M'Naughten* rule. The discussion concerning psychiatric testimony necessarily follows.

BECK, Judge, concurring:

I join in the majority's conclusion that the bodily injury suffered by appellee Van Kirk falls within the exclusion from coverage for bodily injury which is expected or intended by the insured. I agree that the "irrational impulse" test adopted by the trial court is inapplicable to the coverage question presented by this case.

I write separately only to express my view that it is unnecessary to the decision of this case to opine on the pertinence of the M'Naghten Rule as the majority does in the concluding paragraphs of its Opinion. This case clearly does not involve an insured who could be deemed to be insane under the M'Naghten Rule and neither party makes such an argument. Nor did the trial court opine on this subject. Thus, I find it unnecessary to express any opinion on the relevance of the M'Naghten Rule to the coverage question presented and I do not join in the majority's dicta on that subject.

I further find it unnecessary to opine, as the majority does, on the general relevance or usefulness of expert psychiatric testimony in cases such as this. I agree that in this case the expert testimony must be viewed as irrelevant, since it was directed only to whether the insured was acting on an irrational impulse and we have decided that this determination is irrelevant to the coverage issue. I do not agree with the majority's broad pronouncement that expert psychiatric testimony is always irrelevant in a case where the issue posed is whether the insured expected or intended the bodily injury or property damage for which coverage is sought. The relevance of such testimony depends completely upon the facts of the particular case. I see no need to opine on the possible relevance of such testimony in any context other than the facts of this case.