## Erie Insurance Exchange v. Heisey

C.P. of Lebanon County, no. 2005-00443.

*Allan C. Molotsky,* for plaintiff.
*Greer H. Anderson,* for defendants.

CHARLES, *J.,* February 12, 2007—On February 19, 2002, Janie S. Ream tragically lost her life when Warren Heisey shot her three times in the head. The echoes of these shots are still reverberating today, as Ream's estate is seeking to collect money under Heisey's homeowner's insurance policy with Erie Insurance Exchange. Predictably, Erie argues that Heisey's murder of Ream is not an event covered under its policy.

For reasons that follow, we will declare that no coverage exists under Erie's policy for the senseless act of violence committed by Heisey.

## I. PROCEDURAL HISTORY

On February 26, 2004, Dawn R. Ream, administratrix of the estate of Janie Ream initiated a civil action against Heisey under Pennsylvania's wrongful death and survival acts. This complaint sought monetary damages as a result of Ream's premature death at the hands of Heisey. The complaint also alleged that Heisey suffered from a mental illness at the time he shot and killed Ream. According to the complaint: "Because of defendant's mental illness, and his mental state in general, defendant's actions were not intentional, conscious or knowing." (¶12 of complaint.)

A copy of this complaint was mailed to Erie by Estate's attorney. (Exhibits G, H and J to stipulation of facts.)

Erie disavowed any responsibility to defend or indemnify Heisey. (See exhibit I to stipulation of facts.) Eventually, Estate requested and received a default judgment against Heisey and we conducted a bench trial on damages, awarding a total of $226,861 by order dated November 4, 2005.

On March 31, 2005, Erie filed a declaratory judgment action against Heisey and Estate, seeking a declaration that it had no duty to neither defend nor indemnify Heisey as a result of the shooting that occurred on February 19, 2002. Erie alleged that the shooting by Heisey was an intentional act for which no coverage exists under its homeowner's insurance policy. Estate filed an answer and new matter to Erie's declaratory judgment complaint, alleging that Heisey's acts were not intentional because he had been suffering from a serious mental illness at the time.

Following discovery, both parties submitted motions for summary judgment. On October 18, 2006, the parties submitted an extensive stipulation of facts that included police reports, psychiatric reports, court documents relative to Heisey's criminal charges and information pertaining to Erie's insurance policy. We conducted oral argument on the cross-motions for summary judgment on January 26, 2007 and have received briefs from both sides. The issue of whether Erie's policy provides coverage to Heisey is now before us for disposition.

## II. FACTUAL SUMMARY

The factual basis for the parties' motions for summary judgment is contained exclusively within the joint stipu-

lation of facts submitted to this court. A significant percentage of that stipulation presents information regarding the criminal investigation and prosecution of Heisey. Based upon the stipulation, we will summarize the facts surrounding the February 19, 2002 incident.

Prior to February 19, 2002, Ream was involved in a romantic relationship with Heisey. (¶12 of stipulation.) According to one of Ream's best friends, Ream decided to "kick Warren out" of her residence and communicated this to him at some point during the day of February 19, 2002. (See exhibit K.) At about 7:30 p.m. on February 19, Ream contacted the Pennsylvania State Police via the 911 emergency line. She was speaking in a "frantic voice" and stated that her "ex-boyfriend" was outside her home. She pleaded with police to "hurry" and stated "he's nuts." Heisey entered the home, but Ream did not terminate her telephone conversation with the police dispatcher. Upon review of the 911 tape, police heard Ream's voice state "He's got a gun," "No. Warren. What's the matter with you?" and "Come on, Warren." Also depicted on the 911 tape was a male voice saying "Out the door. The car's up the street. Now get going . . . no arguing." The dispatcher described Ream's voice as "becoming more frantic" and described sounds that were perceived as accompanying a struggle. Three gunshots were then heard on the 911 tape. (Exhibit G to the stipulation.)

When police arrived, they observed Heisey entering his vehicle. The vehicle sped away from the scene. Police pursued the vehicle. Ultimately, the vehicle stopped after striking the front end of a Pennsylvania State Police patrol car. Heisey was then apprehended. Located inside his vehicle was a .22 caliber revolver and ammu-

nition. (All information on this paragraph is contained in the affidavit of probable cause attached as exhibit I to the stipulation and in the transcript of the 911 call that was attached as exhibit G to the stipulation.)

According to the autopsy report, Ream died as a result of multiple gunshot wounds. All three wounds were located in Ream's head. Any one of the wounds would have been fatal. (See exhibit N to stipulation.)

As a result of this incident, Heisey was charged with numerous crimes, the most serious of which was criminal homicide. (Exhibit O to stipulation.) The criminal complaint charged that Heisey "intentionally, knowingly, recklessly or negligently caused the death of Janie Ream by shooting Ream in the head with a .22 caliber revolver in the kitchen of Ream's residence." (Exhibit O to stipulation.) Attorney Jerry Russo was hired to represent Heisey. He proffered an insanity defense.

On January 22, 2003, Dr. Abraham Hostetter met with Heisey for the purpose of evaluating his mental capacity on the date of the shooting. (Exhibit Q to stipulation.) As a result of Dr. Hostetter's initial report, the district attorney and Heisey's lawyer stipulated that Heisey should be transferred to a secure forensic psychiatric unit for more testing and treatment. (Exhibit P to stipulation.) On November 20, 2002, Dr. Mangala Khadilkar of the Norristown State Hospital issued a report that diagnosed Heisey as having bipolar disorder with psychosis. The treatment team at Norristown considered Heisey competent to proceed with his trial. (Exhibit R to stipulation.) Shortly after the Norristown State Hospital report, Dr. Hostetter supplemented his initial opinion by a letter

dated January 27, 2003. Dr. Hostetter concluded that Heisey's psychiatric condition was a "dementing process." However, Dr. Hostetter stopped short of rendering an opinion declaring Heisey to be legally insane. (Exhibit S to stipulation.)

On April 4, 2003, Heisey entered a plea of guilty but mentally ill to third-degree murder, burglary, four counts of aggravated assault, four counts of recklessly endangering another person and fleeing and eluding a police officer. The court accepted this plea, concluding that Heisey "understood the nature and consequences of his act when he committed it." (Exhibit T to stipulation.) Heisey was sentenced to an aggregate indeterminate sentence of incarceration, the minimum of which was 21 1/2 years and the maximum of which was 50 years. (Exhibit T.) At all times pertinent to the civil litigation now before us, Heisey has resided in either a secure psychiatric facility or prison.

## III. CONTENTIONS OF THE PARTIES

### A. *Erie's Arguments*

Erie has submitted three primary arguments. Because one of these arguments is not pertinent to our decision,[1] we will only be outlining the two arguments upon which we will base our decision:

(1) The shooting death of Janie Ream does not constitute a covered occurrence—Erie points out that its policy

---

1. Erie has also argued that Heisey failed to give notice of the lawsuit, which is a violation of policy conditions. Because it is not necessary for us to address this argument in order to render our decision, we will leave an analysis of Erie's notice argument for another day.

only provides coverage for an "occurrence" that takes place during the policy period. (See exhibit F at p. 14 under "Our Promise.") The term "occurrence" is specifically defined in the policy as "an accident, including continuous or repeated exposure to the same general harmful conditions." (Exhibit F at p. 5, definition of "occurrence.") Erie argues that the shooting death of Ream was not an occurrence under these policy conditions. Hence, Erie asserts that its policy does not provide liability coverage to Heisey.

(2) The intentional act exclusion of Erie's policy precludes coverage—Erie's policy also contains various exclusions. Of import to this case is the so-called "intentional act exclusion." This exclusion precludes coverage that was "expected or intended by anyone we protect . . . ." (See exhibit F at p. 15, exclusion no. 1.) Erie argues that Heisey's shooting of Ream was an intentional act for which its exclusion precludes coverage.

## B. *Estate's Arguments*

Estate focuses on Heisey's mental health status. Estate points out that Heisey's plea to the charge of homicide was one of "guilty but mentally ill." This plea was based upon a diagnosis of bipolar disorder with psychosis rendered by a psychiatrist shortly after Heisey's arrest. Estate's argument is summarized on page 4 of her brief: "Because Heisey could not have formed intent because he did not understand the consequences of his actions, Heisey's acts were not intentional, and therefore Erie owes Heisey the duty to indemnify under its insurance policy." (Heisey's brief at p. 4.)

## IV. DISCUSSION

When construing the language of an insurance policy, our goal is to ascertain the intent of the parties as manifested by the language of the written instrument. *QBE Insurance Corp. v. M & S Landis Corporation,* 915 A.2d 1222 (Pa. Super. 2007), citing *Madison Construction Company v. Harleysville Mutual Insurance Company,* 557 Pa. 595, 735 A.2d 100 (1999). If the language of a policy is clear, it is to be applied as written. *Standard Venetian Blind Co. v. American Empire Insurance Co.,* 503 Pa. 300, 469 A.2d 563 (1983). We are to supply an interpretation to the meaning of an insurance policy only if the terms are ambiguous so that "more than one reasonable interpretation" can be gleaned. *Madison Construction Company, supra* at 606, 735 A.2d at 106. Generally speaking, "courts should try to read policy provisions to avoid ambiguities, if possible, and not torture language to create them." *Brosovic v. Nationwide Mutual Insurance Company,* 841 A.2d 1071, 1073 (Pa. Super. 2004). As instructed by the Pennsylvania Superior Court en banc, when the wording of an insurance policy is clear, we are to "enforce it." *Donegal Mutual Insurance Company v. Baumhammers,* 893 A.2d 797, 818 (Pa. Super. 2006).

In this case, we are confronted with two policy provisions. The first involves the definition of a covered "occurrence" and the second pertains to the so-called "intentional act exclusion." Our analysis with respect to each of these policy provisions will be set forth below.

## (1) Did An "Occurrence" Exist Within the Meaning of the Policy?

Our first duty in a coverage dispute is to examine whether an occurrence exists that would trigger coverage, *Minnesota Fire and Casualty Company v. Greenfield,* 579 Pa. 333, 855 A.2d 854 (2004) at n.6. Our Superior Court has determined that a policy provision which defines "occurrence" as an "accident" is clear and unambiguous. *Donegal Mutual Insurance Company v. Baumhammers, supra* at p. 806. Because the Erie policy at issue here defines "occurrence" as an "accident," we must determine whether Ream's death was an "accident."

Four Pennsylvania cases have addressed the identical insurance language at issue in this case within the context of intentional attacks. See *Donegal Mutual Insurance Company v. Baumhammers, supra; Gene's Restaurant Inc. v. Nationwide Insurance Co.,* 519 Pa. 306, 548 A.2d 246 (1988); *Britamco Underwriters Inc. v. Grzeskiewicz,* 433 Pa. Super. 55, 639 A.2d 1208 (1994); and *Britamco Underwriters Inc. v. Weiner,* 431 Pa. Super. 276, 636 A.2d 649 (1994).[2] Two of these cases were resolved in favor of coverage *(Baumhammers* and *Weiner),* while two were resolved against coverage *(Gene's Restaurant* and *Grzeskiewicz).* An analysis of the reasoning for the disparate decisions will guide us as we contemplate the facts before us.

In *Gene's Restaurant,* a restaurant was sued as a result of its employee's intentional assault upon a patron. Pennsylvania's Supreme Court declared that this event

2. In order to avoid confusion, we will refer to the latter two cases as *Grzeskiewicz* and *Weiner.*

was not accidental, and therefore did not constitute an "occurrence"; "willful and malicious assault alleged in the complaint is not an accident but rather is an intentional tort. As such, it is not covered by the policy . . . ." *Id.* at 309, 548 A.2d at 247. In reaching this conclusion, the Supreme Court emphatically stated that an " 'occurrence' must be [accidental] which a malicious, willful assault and beating could never be." *Id.* at 309 n.1, 548 A.2d at 247 n.1.

Similarly, *Grzeskiewicz* involved an assault at an insured bar. The assault occurred when one patron attacked another with a broken beer bottle. A panel of our Superior Court held that no occurrence existed. The court essentially concluded that irregardless of whether negligence by an insured may have led to the incident, an attack could never be considered an accident.

A different result was reached in *Weiner, supra.* There, like in *Grzeskiewicz,* a bar patron sued the insured bar because he was assaulted and injured by another patron. The court emphasized that the complaint alleged that the bar was negligent in failing to adequately protect business invitees who had a known propensity for violence. In *Weiner,* the Superior Court held that this was enough to trigger a duty to defend.

The last, and arguably most important, appellate court decision is *Baumhammers, supra.* In *Baumhammers,* the en banc Superior Court conducted a lengthy analysis of the language in *Gene's Restaurant, Weiner,* and *Grzeskiewicz.* In its analysis, the Superior Court specifically rejected its own panel's decision in *Grzeskiewicz, supra,* describing the language of that case as compelling an "anomalous result." *Id.* at 809. Relying on the

language in *Gene's Restaurant, Weiner,* and the Third Circuit of Appeals decision in *Nationwide Mutual Fire Insurance Company v. Pipher,* 140 F.3d 222 (3d Cir. 1998) (applying Pennsylvania law), the Superior Court in *Baumhammers* focused on whether the insured, and not a third person, was the one who perpetrated the attack.

*Baumhammers* was spawned when Richard Baumhammers embarked on a shooting spree, killing five people and seriously injuring another. Mr. Baumhammers was subsequently convicted of first-degree murder. Thereafter, several victims sued Baumhammers' parents, alleging that the parents were negligent because they did not take possession of Baumhammers' gun or alert authorities when they knew or should have known that Baumhammers was going to begin his deadly spree. Faced with this scenario, the Superior Court accepted as self-evident that the acts of Richard Baumhammers were intentional and not accidental. However, the Superior Court distinguished between intentional conduct of an insured and intentional conduct of third persons. The court noted, "It is the intentional conduct of the *insured* which precludes coverage, not the acts of third parties." *Id.* at 809, citing *Pipher* at 226. (emphasis in original) Because Donegal's policy insured Baumhammers' parents, and because the allegations against Baumhammers' parents sounded in negligence, the court held that coverage existed, holding "negligence leading to intentional acts may nevertheless be considered an 'accident' and thus an 'occurrence' where so defined." *Id.* at 810. (footnote omitted)

One other appellate decision deserves mention because it addresses the meaning of "accident" within an insur-

ance context. The case of *Kvaerner Metals Division v. Commercial Union Insurance Company,* 589 Pa. 317, 908 A.2d 888 (2006), involved a faulty workmanship damages claim. Even though *Kvaerner* did not involve an act of criminality, the language used by the Supreme Court is nonetheless helpful. In *Kvaerner,* the Supreme Court recognized that its decision hinged upon "what constitutes an accident under the policy." *Id.* at 332, 908 A.2d at 897. In searching for a definition of accident, the Supreme Court consulted Webster's New College Dictionary to define accident as "an unexpected and undesirable event," or "something that occurs unexpectedly or unintentionally." *The key term in the ordinary definition of "accident" is "unexpected." Id.* at 333, 908 A.2d at 897-98, citing Webster's II New College Dictionary (2001) at 6. (emphasis supplied)

From the above, we reach the following conclusions:

(1) Erie's insurance policy, which defines "occurrence" as an "accident," is clear and unambiguous. Accordingly, we must enforce it as written.

(2) Under Pennsylvania law, our decision of whether an incident was accidental must focus upon whether it was unexpected by the insured.

(3) When one person attacks another, resulting harm will not be "unexpected" by the attacker.

(4) As it relates to a perpetrator such as Heisey, an attack upon another human being will never be considered an "accident" under Pennsylvania law.

In light of the above conclusions, we hold that Heisey's act of shooting and killing Ream was not an "accident."

Accordingly, as it relates to Heisey, the shooting of Janie Ream was not an "occurrence" that would trigger coverage under Erie's homeowner's insurance policy. We therefore grant Erie's motion for summary judgment and deny the one filed by Estate.

(2) Intentional Act Exclusion

Most homeowner's insurance polices contain so-called intentional act exclusions. These exclusions have been applied by our appellate courts to deny coverage where an insured "desired to cause the consequences of his act or if he acted knowingly that such consequences were substantially certain to result." *United Services Automobile Association v. Elitzky,* 358 Pa. Super. 362, 375, 517 A.2d 982, 989 (1986); *Donegal Mutual Insurance Company v. Ferrara,* 380 Pa. Super. 588, 552 A.2d 699 (1989); *Baumhammers, supra* at 822; and *Germantown Insurance Company v. Martin,* 407 Pa. Super. 326, 595 A.2d 1172 (1991). In determining whether an actor intended his harm, our appellate courts have referenced the definition of intent set forth in the Restatement (Second) of Torts, §8A. See *Elitzky, supra* at 369, 517 A.2d at 986 and *Baumhammers, supra* at 822. There, the word intent is used "to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." Restatement (Second) of Torts, §8A. In assessing a person's intent, "an actor is presumed to intend the natural and probable consequences of his actions." *Baumhammers, supra* at 823, citing *Commonwealth v. Sirianni,* 286 Pa. Super. 176, 183 n.7, 428 A.2d 629, 633 n.7 (1981).

At oral argument, we questioned whether Estate and/ or Heisey should be estopped from challenging intent given that Heisey entered a plea of guilty to third-degree murder. In response to our inquiry, we were directed to the case of *Stidham v. Millvale Sportsmen's Club,* 421 Pa. Super. 548, 618 A.2d 945 (1992). There, the court emphasized that third-degree murder is founded upon malice and that malice does not necessarily prove that acts were intentional; legal malice may be predicated on a failure to perceive the risk an action can take. *Id.* at 560, 618 A.2d at 952. While *Stidham* did acknowledge that an insured's guilty plea is admissible as an admission against interest, the mere fact of the plea, by itself, does not establish an intentional act. Therefore, we must look beyond Heisey's plea to examine all of the other facts and circumstances presented.

In this case, the record clearly reveals that Heisey entered the residence of Janie Ream against Ms. Ream's wishes. A confrontation occurred that was recorded in large part via the 911 emergency system. The recording revealed that Ream was reluctant to comply with Heisey's desire to transport her somewhere else. When Ream expressed her reluctance, Heisey discharged his .22 caliber revolver three times. Each shot struck Ream in the head.

When one individual takes a gun and discharges it three times into the head of another, only one conclusion can be reached—the shooter intended to kill the victim.[3]

3. Under Pennsylvania criminal law, when an individual discharges a firearm at a vital part of another person's body, that individual is presumed to have the specific intent to kill. See *e.g., Commonwealth v. Packard,* 767 A.2d 1068 (Pa Super 2001). ("Such [specific intent to

Without disputing this general proposition, Estate nonetheless argues that Heisey's act was not intentional because it was the product of a mental illness. In support of this proposition, Estate presents an opinion from Dr. Abraham Hostetter and asserts that we are bound by Dr. Hostetter's opinion because he was the only expert who produced an opinion within the stipulated statement of facts.

We disagree with both the premise—that a mental illness can negate intent for purposes of evaluating the intentional act exclusion—and the conclusion—that Heisey lacked intent due to his mental illness—of Estate's argument. Therefore, we will reject it.

Legally, an act will not be transformed from intentional to unintentional merely because a psychiatrist provides evidence of mental incapacity. In *Baumhammers,* the court applied an experiential and common sense definition of "intent" and stated "psychiatric testimony may not be used to suggest that Baumhammers' acts were unintentional." *Id.* at 823.

Even more explicit is the case of *Germantown Insurance Company v. Martin, supra,* which is very close factually to the one now before us. *Martin* involved an incident where Robert Martin entered a home and shot three people, killing two. The victims' family sued Martin, claiming that they had been harmed by a "negligent shooting." The trial court concluded that Martin was deranged and ordered Germantown Insurance Company to defend Martin. The Superior Court reversed based upon the in-

---

kill] may reasonably be inferred from an accused's use of a deadly weapon on a vital part of the victim's body." *Id.* at 1071.)

tentional act exclusion. Of significant import was the Superior Court's language regarding the psychiatric issue:

"That Martin's acts were senseless, irrational and incomprehensible to the trial court or anyone else has no bearing on determining coverage under the policy. The record before us discloses Martin brought about the harm he intended. Obviously, no rational person would go on a shooting spree, but this in no way lessens the intentional character of the conduct, if such intent is evidenced. . . .

"As occurred in this trial, once the court moves beyond the clear meaning of the policy and delves into the subjective state of mind or rationality of the actor, it becomes a contest between psychiatric experts, one of whom can be found to testify on any position. The psychiatric testimony in this case appears to be irrelevant to the issue of coverage for purposes of Germantown representation." *Id.* at 334, 595 A.2d at 1176. (footnote omitted) Based upon *Baumhammers* and *Martin,* our focus must be upon the conduct of Heisey, and not his mental capacity.[4]

Even if Heisey's subjective psychiatric condition was legally relevant, we would still reject Estate's argument. In this case, Heisey shot Ream three times, striking her in the head with all three shots. Thereafter, he fled the scene and led police on a high-speed chase. Under Penn-

---

4. In addition to the intentional act exclusion, *Martin* also declared that coverage for an individual who committed murder would be contrary to public policy in Pennsylvania. *Id.* at 333, 595 A.2d at 1175. Although public policy was also raised within Erie's brief we do not find it necessary to base our decision upon notions of public policy

sylvania law, an actor who discharges a gun at a vital part of another's body is presumed to have a specific intent to kill. See *Commonwealth v. Packard*, 767 A.2d 1068 (Pa. Super. 2001). In addition, an individual who flees from the scene of a crime can be inferred to have consciousness of guilt. See *e.g., Commonwealth v. Rios*, 546 Pa. 271, 291, 684 A.2d 1025, 1035 (1996). To us, the report of Dr. Hostetter issued in 2006[5] is not sufficient to overcome all of the other evidence that is probative of Heisey's intent to kill Ream.

In this case, we are satisfied that Heisey committed an intentional act, as that term is defined in Erie's policy. Accordingly, the policy does not provide coverage for Heisey. For this reason also, we will grant Erie's motion for summary judgment and deny the one filed by Estate.

## V. CONCLUSION

Based upon the foregoing, we conclude that Heisey's shooting of Ream was not an "accident." Therefore, it was not a covered "occurrence" under Erie's policy. In

---

5. We do note that Dr. Hostetter rendered an opinion on May 31, 2006 that Heisey's actions against Ream were the result of a "severe psychiatric condition" which rendered him "unable to form the specific intent to commit the acts he carried out." (See exhibit U to stipulation of facts.) It is certainly curious to us that Dr. Hostetter did not render these opinions in either of the reports he submitted to Heisey's criminal defense counsel closer to the date of the homicide. (See exhibit S and exhibit Q to stipulation of facts.) We also find it curious that Dr. Hostetter reported in his initial opinions that Heisey could not remember any details surrounding the homicide (see exhibit S at p. 2), yet details such as Heisey's belief that another man was in the house with Ream were contained in Dr. Hostetter's 2006 report. (See exhibit U at p. 3.)

addition, we conclude that Heisey intended to kill Janie Ream and that Ms. Ream's death should have been and was expected by Heisey once he discharged three bullets into her head. Thus, the intentional act exclusion in Erie's policy also applies.

For either of the above reasons—no "occurrence" or "intentional act"—no coverage exists for Heisey under Erie's homeowner's insurance policy. Accordingly, we will grant Erie's motion for summary judgment on its declaratory judgment complaint and will deny the cross-motion for summary judgment filed by defendants. An order consistent with the above will be entered this date.

## ORDER

And now, February 12, 2007, upon consideration of the stipulation of facts submitted by the parties and upon consideration of the arguments presented, the order of this court is as follows:

(1) The motion for summary judgment of plaintiff Erie Insurance Exchange is granted.

(2) The cross-motion for summary judgment filed by defendants is denied.

(3) We enter a judgment in favor of plaintiff declaring that no coverage exists under Erie Insurance Exchange's Broad Cover Home Protector Insurance Policy as a result of the shooting death of Janie Ream that occurred on February 19, 2002.