LEXINGTON INSURANCE
COMPANY, Appellant

v.

The **CHARTER OAK FIRE INSURANCE COMPANY; North River Insurance Company; JPC–Jay Dee, Joint Venture, LLP; JPC Group, Inc., City of Philadelphia; Protection Services, Inc. and Sabrina Childs, Individually and as Wife and Administratrix of the Estate of Albert Childs, Appellees.**

Superior Court of Pennsylvania.

Argued Sept. 17, 2013.

Filed Nov. 6, 2013.

Reargument Denied Jan. 10, 2014.

Louis C. Long, Pittsburgh, for appellant.

Wendy H. Koch, Jenkintown, for North River, appellee.

BEFORE: BENDER, P.J., DONOHUE, J., and MUSMANNO, J.

OPINION BY BENDER, P.J.

Lexington Insurance Company (Lexington) appeals from the order entered September 7, 2012, granting summary judgment to North River Insurance Company (North River) in this insurance coverage dispute. We reverse in part, affirm in part, and remand.

In 2005, the City of Philadelphia (City) undertook a flood control project in the Dobson Run area of Fairmont Park. The City contracted with CMX, Inc., formerly known as Schoor DePalma, Inc., (collectively, CMX) for engineering services on the project. CMX was required to maintain insurance and indemnify the City. To meet this obligation, CMX maintained a commercial general liability insurance policy through The Hartford Fire Insurance Company (Hartford) and a professional services liability insurance policy through Lexington.

In 2006, JPC Group, Inc. (JPC) and Jay Dee Contractors, Inc. (Jay Dee) formed a joint venture, known as JPC–Jay Dee, and bid to perform certain work on the project. The City accepted their bid. Thereafter, JPC–Jay Dee subcontracted a portion of the work to JPC and other work to Jay Dee.

The JPC subcontract required JPC to maintain $10 million in "primary and non-contributing" general liability coverage. *See* North River Motion for Summary Judgment on the Issue of the Duty to

Defend, Exhibit H (JPC Subcontract), at 7. The JPC subcontract further required JPC to name CMX as additional insured on each of its insurance policies for the project. *Id.*

To meet its coverage obligation, JPC maintained policies through The Charter Oak Fire Insurance Company (Charter Oak) and North River. The Charter Oak policy provided $1 million general liability coverage per occurrence. The North River policy provided $20 million in liability coverage per occurrence. The North River policy functioned as excess insurance to the Charter Oak policy. *See* North River Motion for Summary Judgment on the Issue of the Duty to Defend, Exhibit A, "Schedule A—Schedule of Underlying Insurance" (Schedule A), at 1; "Commercial Umbrella Policy" (Commercial Umbrella Policy), at 3.

The North River policy afforded liability coverage to CMX as an additional insured, defined as follows:

[A]ny person, organization, trust, or estate that has obligated you [*i.e.,* JPC] by an "Insured Contract" to provide the insurance that is afforded by this policy, but this policy applies:

a. only up to the policy limits required by the "Insured Contract," subject to the limits of this policy; and,

b. only with respect to "Bodily Injury," "Property Damage" or "Personal and Advertising Injury" that occurs subsequent to the time you enter into the "Insured Contract;" and,

c. only with respect to liability arising out of "Your Work," "Your Product," or property owned or used by you, or with respect to other liability arising out of your negligence.

*See* North River Motion for Summary Judgment on the Issue of the Duty to Defend, Exhibit A, "Commercial Umbrella Policy" (Commercial Umbrella Policy), at 6–7. Thus, despite the North River policy limit of $20 million, CMX was entitled to $9 million coverage.

The North River policy required the insurer to provide its insureds a defense against any suits seeking damages covered by its terms:

A. We will have the right and duty to defend the Insured against any "Suit" seeking damages, or damages and "Covered Pollution Cost or Expense," covered by the terms and conditions of this policy, even if the allegations are groundless, false, or fraudulent, when:

1. the applicable limits of "Underlying Insurance" and "Other Insurance" have been exhausted by payment of judgments or settlements; or

2. damages, or damages and "Covered Pollution Cost or Expense," are sought which are not covered by the terms and conditions of "Underlying Insurance" or "Other Insurance."

· · ·

E. We will not defend any "suit" after we have exhausted by payment of settlements or judgments the applicable Limits of Insurance.

Commercial Umbrella Policy, at 4–5. Underlying insurance is defined as those policies and/or self-insurance identified in Schedule A. *Id.* at 13. The Charter Oak policy is underlying insurance. *See* Schedule A. Other insurance refers to (1) any insurance policy affording coverage for damages for which the North River policy also provides coverage and (2) self-insurance, but it does not include underlying insurance or insurance purchased expressly to apply in excess of the North River Policy. *See* Commercial Umbrella Policy, at 11–12. The Hartford policy maintained by CMX is other insurance as defined by the North River policy.

The availability of other insurance and its impact on the coverage afforded by the North River policy is further addressed in the following manner:

If there is any collectible "Other Insurance" available to the Insured, (whether such Insurance is stated to be primary, contributing, excess or contingent), the insurance provided by this policy will apply in excess of, and shall not contribute with such "Other Insurance." This Condition does not apply to any insurance policy purchased specifically to apply in excess of this policy.

However, with respect to any person or organization qualifying as an [additional insured], this policy will apply before any "Other Insurance" that is excess insurance available to the insured so long as:

1. insurance with limits equal to or exceeding the limits of "Underlying Insurance" is available to and collectible by the Insured; and

2. the "Insured Contract" giving rise to Insured status specifically requires that this insurance apply before such other excess insurance.

*Id.* at 28.

Finally, the North River policy includes a professional services exclusion. The policy does not provide coverage for:

"Bodily Injury" or "Property Damage" or "Personal and Advertising Injury" due to rendering or failure to render any professional service. This includes but is not limited to:

. . .

2. Preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; [and]

3. Engineering services, including related supervisory or inspection services[.]

*Id.* at 21.

In September 2007, bicyclist Albert Childs sustained injuries when a motorist struck him at the site of the Dobson Run project. Mr. Childs eventually died from his injuries. A complaint filed on behalf of his wife and estate alleged numerous acts and omissions of negligence and named several defendants, including the City, the contractor, the subcontractors, and CMX. *See* CMX Complaint, Exhibit A, "Civil Action Complaint" (Childs Complaint), at 13–15. Expert reports filed on behalf of Mrs. Childs support claims of professional negligence against CMX. These reports were submitted beginning January 4, 2010. *See* North River Motion for Summary Judgment on the Issue of the Duty to Defend, Exhibit O, "Hintersteiner Report" (Hintersteiner Report), at 1.

Settlement negotiations ensued. On December 3, 2009, Mrs. Childs, individually and as administratrix of the estate, signed a Joint Tortfeasor Release that settled all claims against the City, the contractor, and the subcontractors related to the accident in exchange for the payment of $10 million. *See* North River Motion for Summary Judgment on the Issue of the Duty to Defend, Exhibit P, "Joint Tortfeasor Release" (Joint Tortfeasor Release), at 1–4. CMX was not a party to the release. On January 26, 2010, Charter Oak tendered payment in the amount of $1 million. North River tendered $9 million on February 2, 2010. Independently, CMX also settled for the amount of $2 million, with payment tendered by Lexington on March 18, 2010. Hartford denied CMX coverage under its policy.

On several occasions beginning October 20, 2009, CMX tendered its defense to North River. Each time, North River de-

clined to contribute to CMX's defense on the ground that its duty to defend was not triggered per the terms of its policy.

CMX commenced this action in January 2010, alleging that North River violated its duty to defend and indemnify CMX in the Childs action. CMX also claimed North River engaged in bad faith.[1] In April 2011, Lexington was substituted for CMX as plaintiff. North River filed two motions for summary judgment, one asserting it had no duty to defend CMX, the other asserting no duty to indemnify, thus negating Lexington's bad faith claim. The trial court granted both motions, but dispositive was its conclusion that North River's duty to defend CMX was not triggered. According to the trial court, the available limits of both CMX's "underlying insurance" and "other insurance," respectively the Charter Oak policy and the Hartford policy, were not exhausted. Lexington's motion for reconsideration was denied, and its appeal was timely filed.[2]

This case involves questions regarding an insurer's duty to defend and indemnify its insured. Our scope and standard of review are well settled:

In analyzing the order of [a] trial court that granted summary judgment [ ], our scope of review is plenary. The standard of review is clear; we will reverse the order of the trial court only when the court committed an error of law or abused its discretion. Summary judgment is appropriate only when the record clearly shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. The reviewing court must view the record in the light most favorable to the nonmoving party and

resolve all doubts as to the existence of a genuine issue of material fact against the moving party. Only when the facts are so clear that reasonable minds could not differ can a trial court properly enter summary judgment.

*Kvaerner Metals Div. Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 589 Pa. 317, 908 A.2d 888, 895–96 (2006) (internal citations omitted) (Kvaerner).

The interpretation of an insurance policy is a question of law that we review *de novo. Donegal Mut. Ins. Co. v. Baumhammers*, 595 Pa. 147, 938 A.2d 286, 290 (2007) (*Baumhammers* ) (citing *Kvaerner*, 908 A.2d at 893).

Our purpose in interpreting insurance contracts is to ascertain the intent of the parties as manifested by the terms used in the written insurance policy. When the language is clear and unambiguous, we must give effect to that language. However, when a provision in the policy is ambiguous, the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy and controls coverage.

*Id.* (internal quotations and citations omitted).

On appeal, Lexington asserts that the trial court erred in its strict interpretation of the North River policy exhaustion clause. According to Lexington, when it first presented its tender to North River, it was already fully engaged in settlement negotiations and soon thereafter reached an agreement, along with Charter Oak, to settle some of the claims asserted in the Childs action. The settlement amount would reach the Charter Oak policy limits

1. CMX alleged similar claims against Charter Oak but settled prior to the North River motions for summary judgment.

2. The trial court did not direct Lexington to file a Pa.R.A.P. 1925(b) statement.

upon payment. Thus, even though actual payment did not occur for another two months, the Charter Oak policy was effectively exhausted, triggering North River's duty to defend.

No Pennsylvania appellate court has addressed when an exhaustion clause triggers an excess insurer's duty to defend. In support of its assertion, Lexington cites *Zeig v. Mass. Bonding & Ins. Co.*, 23 F.2d 665 (2d Cir.1928). In that case, a dressmaker purchased property insurance totaling $15,000 in coverage, plus an excess policy that attached after the primary insurance was "exhausted in the payment of claims to the full amount of the expressed limits." *Zeig*, 23 F.2d at 666. In a burglary, Zeig lost more than $15,000 in property. He filed claims for the full amount of his primary coverage, but he eventually settled for less. However, as Zeig's losses were greater than $15,000, he also filed a claim under the excess policy. *Id.* The excess insurer denied coverage on the ground that Zeig had failed to exhaust his underlying policies, and the trial court agreed. *Id.* On appeal, the Honorable Augustus Hand determined the exhaustion clause to be ambiguous and declined to interpret it in a manner "unnecessarily stringent," as it served "no rational advantage" to the insurer. *Id.* Judge Hand concluded that Zeig should be allowed to prove the amount of his loss and, provided he could do so, was entitled to recover the excess amount to the extent of his policy. *Id.*

Similarly, the United States Court of Appeals for the Third Circuit, predicting Pennsylvania law, determined that "a policyholder may recover on the excess policy for a proven loss to the extent it exceeds the primary policy's limits." *Koppers Co., Inc. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1454 (3d Cir.1996). The court concluded that "settlement with the primary insurer functionally 'exhausts' primary coverage and therefore triggers the excess policy." *Id.*

In contrast, North River suggests the *Zeig* and *Koppers* are inapposite to the issue before us. North River correctly observes that neither case concerned a duty to defend. It argues that if this Court were to impose a duty to defend CMX prematurely, its umbrella policy would be improperly transformed into a primary policy. *See Donegal Mut. Ins. Co. v. Long*, 528 Pa. 295, 597 A.2d 1124, 1127–28 (1991). Further, North River asserts that an insurer's duty to defend is purely contractual, and there is no duty unless expressed in the policy. *See Genaeya Corp. v. Harco Nat. Ins. Co.*, 991 A.2d 342, 347 (Pa.Super.2010)

■ In our view, the duty to defend is sufficiently different from the duty to indemnify that we conclude that *Zeig* and *Koppers* are not persuasive. Clearly, one difference is the scope of the duty. The duty to defend is broader than the duty to indemnify. *See Am. and Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 606 Pa. 584, 2 A.3d 526, 540–41 (2010) (*Jerry's Sport Ctr.*) However, the precise question here is not *whether* North River should be required to defend CMX, but rather it is *when* North River's duty arises. Thus, there is a temporal element implicit to the duty to defend that finds no corollary in the *Zeig* or *Koppers* analysis of the duty to indemnify. Moreover, we agree with recent precedent from the Second Circuit, distinguishing *Zeig*. In *Ali v. Fed. Ins. Co.*, 719 F.3d 83, 94 (2d Cir.2013), the Second Circuit concluded that an excess insurer does have a relevant interest in awaiting actual payment of a settlement by the primary insurer. According to the Second Circuit, excess insurers "had good reason" to dissuade insureds from "structur[ing] inflated settlements with their adversaries

... that would have the same effect as requiring [excess insurers] to drop down and assume coverage [prematurely]." *Id.*

Absent binding precedent to the contrary, our analysis is limited to applying longstanding principles to the interpretation of insurance contracts. *See Baumhammers,* 938 A.2d at 290; *Genaeya Corp.,* 991 A.2d at 346–47. After reviewing the North River exhaustion clause, we conclude that its terms are clear and unambiguous. The clause provides that North River "will have the right and duty to defend the [i]nsured ... when the applicable limits of '[u]nderlying [i]nsurance' and '[o]ther [i]nsurance' have been exhausted *by payment of* judgments or settlements." Commercial Umbrella Policy, at 4 (emphasis added). To accept Lexington's interpretation of this clause improperly would render superfluous the "by payment of" language in the North River policy. We must give this language effect. *Baumhammers* at 290. Accordingly, we hold that North River's duty to defend is triggered by the actual payment of the relevant primary insurance.

▆▆ The trial court determined that the Hartford policy was "other insurance" available to CMX and that this policy too must be exhausted by payment. Hartford denied coverage to CMX. The trial court concluded that this denial precluded exhaustion as required, and therefore, North River's duty to defend CMX was not triggered.

We disagree. The terms of the JPC subcontract required JPC to provide CMX with $10 million in *primary* general liability coverage. *See* JPC Subcontract at 7. The plain terms of the North River policy provide that its coverage is primary to "other insurance" available to its additional insureds, provided such coverage is required by contract. *See* Commercial Umbrella Policy at 28. Read in conjunction,

we conclude that the "other insurance" provided by the Hartford policy is excess to that provided by North River. Thus, the exhaustion of the Hartford policy was unnecessary, and North River's duty to defend CMX *arose* upon payment by Charter Oak of its policy limit on January 26, 2010.

▆▆ Lexington also argues that the trial court erred in concluding that the North River policy's professional services exclusion absolved North River of its duty to defend CMX. According to Lexington, the trial court was required to limit its analysis to the four corners of the underlying complaint when determining whether the insurer's duty to defend arises, citing in support *Jerry's Sport Ctr.,* 2 A.3d at 540–41. As the complaint makes general averments of negligence, attributing both general and professional liability to all defendants, Lexington argues that it is impossible to determine whether the claims fall outside the scope of coverage provided by North River. Thus, according to Lexington, it remains North River's duty to defend CMX until it can confine the underlying claims to matters that are beyond the protections afforded by the policy. *See, e.g., Cadwallader v. New Amsterdam Cas. Co.,* 396 Pa. 582, 152 A.2d 484, 488 (1959); *Germantown Ins. Co. v. Martin,* 407 Pa.Super. 326, 595 A.2d 1172, 1174 (1991). We agree that the trial court erred in this regard.

> An insurer's duty to defend is broader than its duty to indemnify. It is a distinct obligation, separate and apart from the insurer's duty to provide coverage. An insurer is obligated to defend its insured if the factual allegations of the complaint on its face encompass an injury that is actually or potentially within the scope of the policy. As long as the complaint might or might not fall within the policy's coverage, the insurance com-

pany is obliged to defend. *Accordingly, it is the potential, rather than the certainty, of a claim falling within the insurance policy that triggers the insurer's duty to defend.*

The question of whether a claim against an insured is potentially covered is answered by comparing the four corners of the insurance contract to the four corners of the complaint. An insurer may not justifiably refuse to defend a claim against its insured unless it is clear from an examination of the allegations in the complaint and the language of the policy that the claim does not potentially come within the coverage of the policy. In making this determination, the factual allegations of the underlying complaint against the insured are to be taken as true and liberally construed in favor of the insured. Indeed, the duty to defend is not limited to meritorious actions; it even extends to actions that are groundless, false, or fraudulent as long as there exists the possibility that the allegations implicate coverage.

*Jerry's Sport Ctr.*, 2 A.3d at 540–41. (emphasis added) (internal quotations, citations, and punctuation omitted).

We have examined the underlying complaint and conclude that it is not possible to determine the precise allegations directed against CMX. The operative paragraph includes 29 sub-paragraphs, alleging both general and professional negligence, and these allegations are directed against all defendants. *See* Childs Complaint at 13–15 ¶ 60. Thus, the complaint includes claims that potentially fall within the insurance policy, *Jerry's Sport Ctr.*, 2 A.3d at 541, and North River may not rely on the professional services exclusion until it can establish that the precise claims against CMX are beyond the scope of coverage. *Cadwallader*, 152 A.2d at 488; *Germantown Ins. Co.*, 595 A.2d at 1174.

North River counters Lexington's argument by pointing to the expert reports submitted in the underlying action that support claims of professional negligence directed toward CMX. It is not clear whether the trial court considered these reports in concluding the professional services exclusion was applicable, but Lexington clearly opposes such consideration.

██ In our view, Lexington reaches too far in its opposition. Litigation is not merely a snapshot of a dispute taken once when a complaint is filed. To the contrary, provided a plaintiff does not change a cause of action, she may liberally amend or "amplif[y] that which has already been averred." *McNeil v. Jordan*, 586 Pa. 413, 894 A.2d 1260, 1268 (2006) (quoting *Connor v. Allegheny General Hosp.*, 501 Pa. 306, 461 A.2d 600 (1983)). The duty to defend persists *until an insurer can limit the claims* such that coverage is impossible. *Cadwallader; Germantown Ins. Co.* Accordingly, there must be some mechanism, such as a declaratory judgment action, by which a court can reexamine the scope of the underlying claims. *See, e.g., Aetna Cas. & Sur. Co. v. Roe*, 437 Pa.Super. 414, 650 A.2d 94, 99 (1994) (citing *Stidham v. Millvale Sportsmen's Club*, 421 Pa.Super. 548, 618 A.2d 945, 954 (1992)). Thus, in the appropriate context, a court must be permitted to consider evidence that would absolve the insurer of its duty to defend. Nevertheless, we conclude that the expert reports in this case are insufficient to confine the claims against CMX outside the scope of coverage afforded by the North River policy. This is because, while they support potential claims of professional negligence, they do not preclude the underlying plaintiffs from also pursuing general negligence claims.

North River's duty to defend CMX persisted until it was "exhausted by payment of settlements or judgments the applicable

[l]imits of [i]nsurance." Commercial Umbrella Policy at 5. The "limits of insurance" is a defined term in the North River policy. *See* Commercial Umbrella Policy at 14–15. However, as an additional insured, the per occurrence coverage limit available to CMX was governed by the JPC subcontract. *See* JPC Subcontract at 7. CMX was entitled to $10 million in primary coverage: $1 million from Charter Oak and $9 million from North River. On February 2, 2010, North River tendered $9 million in satisfaction of the Joint Tortfeasor Release. Thus, we conclude that North River's duty to defend CMX *was extinguished* upon that date.[3]

In review, we conclude that North River's duty to defend CMX *arose* on January 26, 2010, and *was extinguished* on February 2, 2010. Accordingly, we reverse the order of the trial court to the extent it granted North River's motion for summary judgment regarding its duty to defend, and we remand to the trial court for further proceedings in accordance with the above opinion. Nevertheless, we affirm the trial court's order to the extent it granted North River's motion for summary judgment regarding its duty to indemnify and dismissed Lexington's bad faith claim. *See Scopel v. Donegal Mut. Ins. Co.*, 698 A.2d 602, 605 (Pa.Super.1997) (observing that if there is no duty to defend, there can be no duty to indemnify); *Johnson v. Progressive Ins. Co.*, 987 A.2d 781, 784 (Pa.Super.2009) (observing that bad faith is present if there was no reasonable basis for denying benefits); *Plasticert, Inc. v. Westfield Ins. Co.*, 923 A.2d 489, 492 (Pa.Super.2007) (noting that we may affirm the trial court on any valid basis).

---

**3.** We note that the absence of CMX from the Joint Tortfeasor Release does not affect our analysis. *See Anglo–Amer. Ins. Co. v. Molin,* 670 A.2d 194, 199 (Pa.Cmwlth.1995) (concluding that an "insurer should not be precluded from accepting [a reasonable settlement] offer," even if it is for less than all of the insureds). Lexington does not argue that the settlement with Mrs. Childs was unreasonable.

Order reversed in part; affirmed in part. Case remanded. Jurisdiction relinquished.